Lana MARTIN, Employee–Respondent,

v.

TOWN AND COUNTRY SUPERMAR-KETS, Employer–Appellant.

No. 26689.

Missouri Court of Appeals,
Southern District,
Division Two.

March 1, 2007.

Motion for Rehearing or Transfer to Supreme Court Denied March 23, 2007.

J. Bradley Young, St. Louis, MO, for appellant.

James E. Bowles, Piedmont, MO, for respondent.

JEFFREY W. BATES, Chief Judge.

Town and Country Supermarkets (Employer) appeals from a final award of workers' compensation benefits to Lana Martin (Martin). The Labor and Industrial Relations Commission (the Commission) found Martin was permanently and totally disabled from a back injury that she sustained at work. The Commission's award also included reimbursement of Martin's expenses for medical treatment that Employer refused to provide. On appeal, Employer contends the Commission erred in the three respects: (1) awarding Martin permanent total disability benefits because her disability resulted from unauthorized medical care that was neither reasonable nor necessary; (2) awarding Martin permanent total disability benefits because

her disability resulted from an independent intervening cause attributable to her own conduct in seeking unauthorized medical care; and (3) awarding Martin temporary total disability benefits and reimbursement for medical expenses following surgery that was not authorized by Employer. Finding no merit in any of Employer's arguments, we affirm.

## I. Statement of Facts and Procedural History

On January 20, 1997, Martin was working in the delicatessen at Employer's grocery store. As she was reaching up to get a box of donuts from a freezer, she felt something pop in her back and "just went down...." She was taken by ambulance to Lucy Lee Hospital in Poplar Bluff, Missouri, and treated by Dr. Michael Turner. Dr. Turner initially believed Martin had a back fracture based on x-rays taken in the emergency room. Later, Dr. Turner changed his mind and told Martin that her back pain was caused by a congenital defect in her lower spine. He put her in a back brace and took her off work for eight weeks. Martin was discharged from the hospital after a three-day admission.

On February 10, 1997, Martin had a CT scan performed on her lumbar spine and sacroiliac joints at Lucy Lee Hospital. The osteopathic doctor who read the film found no indication of disc herniation. Dr. Turner referred Martin to Dr. Shahid Choudhary, a neurologist.

Dr. Choudhary examined Martin on February 24, 1997. Dr. Choudhary's impression was that it was possible Martin's low back pain was being caused by a mild herniated disc. He decided to treat her conservatively and gave her a home-exercise program. That same day, Martin tried the exercise program and started having severe pain. She reported this problem to Dr. Choudhary by telephone.

He gave her the option of trying pain medication or being referred for a neurosurgical evaluation. Martin chose the latter option, so Dr. Choudhary referred her to Dr. Joseph Miller.

Dr. Miller examined Martin on February 27, 1997. He diagnosed her as having a back strain, gave her some mild back exercises and asked her to gradually increase her activities. He released Martin to return to work on March 10, 1997. Thereafter, Employer provided no further medical aid to Martin.

Martin returned to her job as directed, but she was not able to work 40 hours per week as scheduled. In spite of the medical treatment previously provided by Employer, Martin could only work 4–5 hours, and sometimes less, per day. The pain in her back increased to the point that she was dragging her right leg, and the pain was "almost unbearable." The pain was mostly located in her lower back and down the back of her right leg. Martin asked for permission to see Dr. George Schoedinger, an orthopedic surgeon, but Employer refused to authorize care by this physician. Employer also failed to send Martin to any other physician for treatment of these symptoms.

On March 31, 1997, Martin went to see Dr. Schoedinger. Martin reported that she had burning low back pain that radiated down into her right leg. Dr. Schoedinger reviewed Martin's February 10, 1997 CT scan, which he read as revealing an L5–S1 disc rupture. Dr. Schoedinger initially followed a conservative course of treatment. He ordered additional diagnostic tests and advised Martin to continue working, which she did. In April 1997, Martin underwent magnetic resonance imaging (MRI), myelography and post-myelographic CT scanning. None of these tests revealed any abnormalities. Dr. Schoedinger suspected Martin had a disc

injury to her back, but the abnormality that Dr. Schoedinger observed in the February 10, 1997 CT scan was not mirrored by the other tests. For that reason, he advised Martin to continue working and live with the problem. She followed that advice.

Martin saw Dr. Schoedinger again on May 5, 1997. She was still reporting persistent low back pain that radiated down into her right leg. Although Dr. Schoedinger did not consider Martin to be a surgical candidate at that point, he referred her to a neurologist, Dr. Joe Hanaway, for further diagnostic tests.

Martin's symptoms continued to get worse. She was unable to sleep, sit longer than 30 minutes or do anything around the house. She saw Dr. Hanaway on May 15, 1997. He scheduled her for electromyographic (EMG) studies and advised her not to continue working. Martin complied with this instruction. By June 10, 1997, the EMG studies had been conducted. The results were positive and demonstrated "a lumbar radiculopathy from root pressure in the right lower lumbar region." This was indicative of a ruptured disc. Dr. Hanaway advised Martin to be evaluated again by Dr. Schoedinger to see whether she should have surgery.

Martin saw Dr. Schoedinger again on June 20, 1997. She was still suffering from pain in her low back and right leg. Due to weakness in that leg, she intermittently caught her toe while walking. These were classic symptoms for a ruptured disc and suggested a problem at L4–L5, L5–S1 or both. Martin had gotten to the point that she simply could not stand the pain anymore, and she was told by Dr.

Schoedinger that her condition probably would not get any better without surgery. She agreed to undergo a lumbar discectomy.

The operation was performed on July 10, 1997. Dr. Schoedinger found and removed a ruptured disc at the L5–S1 level that was causing pressure on a nerve root. Martin's post-operative course was uneventful, and she was released from the hospital on July 13, 1997. As a result of this surgery, Martin no longer dragged her right leg, and the pain radiating down into the lower part of that limb occurred much less frequently.

About two weeks after surgery, however, Martin began having severe low back pain radiating to the outer surface of her right hip and the back of her right thigh. This pain, which was caused by inflammatory changes and scarring at the level of the surgery, continued over the next three months. On October 20, 1997, a myelogram performed on Martin revealed a displacement of the thecal sac by reason of a posterior disc protrusion at the L4–L5 level. This was one level above the disc on which Dr. Schoedinger operated in July 1997. The results of the myelogram were replicated by a discogram performed on October 21, 1997. The discogram elicited a pain response at the L4–L5 and L5–S1 levels.

Martin's back pain was severe enough that she was unable to live with her problem. Therefore, Dr. Schoedinger readmitted Martin to the hospital on November 17, 1997 and performed a decompressive laminectomy, discectomy and instrumented interbody fusion at the L4–L5 and L5–S1 levels.[1] During the second surgery, Dr.

---

1. When Dr. Schoedinger placed the instrumentation in Martin's back in 1997, he used a posterior approach. At that time, it was not known that a posterior approach resulted in a far greater incidence of scar formation in the spinal canal. When Dr. Schoedinger was deposed in August 2003, he testified that he had abandoned the posterior approach and switched to anterior instrumentation because the results were far better.

Schoedinger observed another central disc rupture at the L4–L5 level. He believed the stresses imposed on Martin's back after the first surgery probably caused this herniated disc to become symptomatic.

This second surgery produced relief from pain for about two weeks. At that point, Martin began having back and leg pain again. An MRI revealed a fluid collection in the soft tissues of her back. On December 13, 1997, Martin underwent a third operation to determine whether she was having a cerebrospinal fluid leak. No such leak was found. The fluid was removed, and the wound healed without incident. Once again, this procedure produced a substantial, though ultimately temporary, reduction in Martin's back pain.

Following the third surgery, the pain in Martin's back returned. The pain in her right leg, however, became less frequent and less severe than it had been prior to her first surgery. Martin's continuing back pain resulted from nerve root irritation, which was caused by considerable scarring in the area of her surgeries. Dr. Schoedinger was concerned that Martin might be developing arachnoiditis, which is an inflammation of the membranous coverings of the nerve roots and spinal cord.

Dr. Schoedinger continued to treat Martin for her back injury until September 1999. At that point, he concluded that she was unable to return to work due to failed back syndrome. No further orthopedic treatment was recommended. It was Dr. Schoedinger's opinion, to a reasonable degree of medical certainty, that all three surgeries were reasonable and necessary to treat symptoms that arose by reason of Martin's work-related injury. Her disability resulted from the significant scarring that developed around the nerves in the lumbar spine after the first and second surgeries were performed. These continuing symptoms, which prevented Martin from being able to work, were directly related to this scarring.

In March 2004, a hearing was held before an administrative law judge (ALJ) to determine the final award in Martin's workers' compensation claim. Employer stipulated that it had paid $13,143.44 for the medical care Martin received through February 1997 and that she had been paid seven and one-half weeks of temporary total disability benefits. The ALJ identified the following issues for determination:

Issue number one is whether or not the surgeries and resulting disability were medically causally related to the accident or occupational disease. Issue number two is whether or not Dr. Schoedinger's bill of $53,649.99 or the bills relating to Dr. Schoedinger's surgery, whether or not those are—whether there is necessary and causal relationship to the accident. It is stipulated that the charges are reasonable. It is stipulated that authorization for the care from Dr. Schoedinger was refused. No other stipulations are made regarding that. The next issue ... is whether or not any additional temporary total disability is due and it's stipulated for purposes of this hearing that the claimant has not engaged in any substantial activity since the date of the accident and therefore if it is found that the claimant is entitled to additional temporary total disability benefits or permanent total disability benefits, those will run from the date that the temporary total disability paid ceased. It is stipulated that the employee is permanently and totally disabled. However, at issue is whether or not the employer-insurer is legally responsible for that permanent total disability.

Martin testified on her own behalf, and she also introduced the deposition and medical records of Dr. Schoedinger. The

facts recited above were synthesized from these sources.

Employer's evidence consisted of medical records from Dr. Choudhary and Dr. Miller, the substance of which has already been summarized above. Additionally, Employer introduced the deposition of Dr. Sherwyn Wayne, an orthopedic surgeon.[2] Dr. Wayne, who examined Martin in February 1999, opined that Martin demonstrated findings consistent with "failed lumbar surgery syndrome." In Dr. Wayne's opinion, Martin had developed "neural fibrosis and arachnoiditis as a complication of an L5–S1 discectomy, followed by an L4–5 and L5–S1 interbody fusion, and postoperative seroma or abscess." He attributed all of Martin's disability, which he rated at 65% of the body as a whole, to Dr. Schoedinger's surgeries. Dr. Wayne did not believe Martin should have undergone surgery because she had only experienced a lumbar strain at work and had no surgical indications.

It is apparent from Dr. Wayne's testimony that he used a subjective, rather than an objective, standard in deciding whether Dr. Schoedinger's treatment of Martin was reasonable and necessary. On direct examination, Dr. Wayne gave the following testimony:

Q. Now, Doctor, taking everything into consideration, again your examination of Ms. Martin, your review of the medical records, and the history that she had given to you during the course of your examination, do you have an opinion as to whether or not the surgical procedures that were performed on Ms. Martin by Dr. Schoedinger were reasonable?

A. Based on my understanding and indications, I would not have performed any of these procedures; therefore, I would find them unreasonable.

Q. Doctor, based upon your examination of Ms. Martin, your review of the medical records, and the history that she provided to you, do you have an opinion as to whether or not the medical care and the surgical procedures that was rendered by Dr. Schoedinger was necessary?

A. For the same reason, I do not find them to be necessary.

When Dr. Wayne was asked to render an objective opinion on cross-examination, he was unwilling or unable to do so:

Q. So what we're focusing on is whether or not the surgery should have been done at all?

A. Yes.

Q. And do I understand you correctly that you're saying that, to a reasonable degree of medical certainty, that in doing these surgeries Dr. Schoedinger deviated from that degree of care, skill and learning that a reasonably prudent orthopedist would have done under the same or similar circumstances?

[an objection, which the ALJ later overruled, is omitted]

A. I don't believe I could answer that question, sir. The answer is I can't really answer that. I don't feel I'm in a position under these circumstances to answer that question.

. . . .

**2.** Employer also offered a second deposition of Dr. Wayne in which he was asked to review and critique Dr. Schoedinger's deposition. Martin's lawyer objected to the deposition on the ground that it was an improper attempt to impeach and comment on another witness' testimony. The ALJ ultimately sustained the objection, and Employer has not appealed from that ruling.

Q. ... You said [Dr. Schoedinger] did two unnecessary operations, did you not?

A. I said I wouldn't have performed them. If that means it's unnecessary, I guess it's unnecessary.

Q. They weren't reasonable and they weren't necessary?

A. I wouldn't have done them. I think I'm usually reasonable—try to be reasonable in things that I do.

Dr. Wayne's very conservative view on when orthopedic surgery should be performed was further illustrated by his statement during recross-examination that "I, through the years, have evaluated hundreds of individuals who have had operative procedures with serious complications, and a very high percentage of those individuals probably never should have been operated on."

In May 2004, the ALJ entered a final award in Martin's favor. The ALJ made factual findings that: (1) Martin herniated discs in her back when she was injured at work; (2) Dr. Schoedinger's surgical treatment of those herniated discs was reasonable and necessary; and (3) the surgeries alleviated some of the pain that Martin suffered as a result of her back injury. The ALJ specifically found the testimony of Dr. Schoedinger and Martin concerning these issues to be credible, while Dr. Wayne's contrary testimony was found to be unpersuasive. Accordingly, the ALJ concluded that Martin's back injury caused her to become permanently and totally disabled. Martin's request for reimbursement of medical expenses she incurred for Dr. Schoedinger's treatment, however, was denied on the ground that Martin "failed to convince the Court that the employer refused to provide treatment."

On petition for review, the Commission modified the ALJ's award by ordering Employer to reimburse Martin for those medical expenses because "Employer/Insurer furnished medical aid until presented with an opinion with which they disagreed. The employer/insurer then refused further medical aid according to the stipulation of the parties. They did so at their peril." This appeal followed.

## II. Standard of Review

■ In this appeal from a final award by the Commission, we review the findings and award of the Commission rather than those of the ALJ. *McDermott v. City of Northwoods Police Dept.*, 103 S.W.3d 134, 137 (Mo.App.2002). With one exception, the Commission affirmed and adopted the findings and conclusions of the ALJ. Therefore, we review the findings and conclusions of the ALJ as adopted by the Commission on all issues except as to the determination of liability for medical aid not furnished by Employer. *See Sutton v. Vee Jay Cement Contracting Co.*, 37 S.W.3d 803, 807 (Mo.App.2000).

■ An appellate court "shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other: (1) That the commission acted without or in excess of its powers; (2) That the award was procured by fraud; (3) That the facts found by the commission do not support the award; (4) That there was not sufficient, competent evidence in the record to warrant the making of the award." § 287.495.1.[3] "Whether the award is supported by competent and substantial evidence is judged by examining the evidence in the context of the whole record." *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 223 (Mo. banc

---

3. All references to statutes are to RSMo (1994).

2003). Only in rare cases will we find an award by the Commission to be contrary to the overwhelming weight of the evidence. *McCutchen v. Peoplease Corp.*, 195 S.W.3d 421, 424 (Mo.App.2006); *Gibson–Knox v. Classic Print*, 184 S.W.3d 201, 202 (Mo.App.2006).

On appeal, "no additional evidence shall be heard and, in the absence of fraud, the findings of fact made by the commission within its powers shall be conclusive and binding." § 287.495.1. Therefore, we defer to the Commission on issues involving the credibility of witnesses and the weight to be given their testimony. *Pavia v. Smitty's Supermarket*, 118 S.W.3d 228, 234 (Mo.App.2003); *Chatmon v. St. Charles County Ambulance Dist.*, 55 S.W.3d 451, 455–56 (Mo.App.2001). Commission decisions that are interpretations or applications of law, on the other hand, are reviewed for correctness without deference to the Commission's judgment. *Orr v. City of Springfield*, 118 S.W.3d 215, 217 (Mo.App.2003); *Maxon v. Leggett & Platt*, 9 S.W.3d 725, 729 (Mo.App.2000). We independently review questions of law. *Johnson v. Denton Construction Co.*, 911 S.W.2d 286, 287 (Mo. banc 1995).

### III. Discussion and Decision

In Employer's first point, it contends the Commission erred in awarding Martin permanent total disability benefits because her disability resulted from unauthorized medical care that was neither reasonable nor necessary. We disagree.

Medical aid is one component of the compensation that an injured worker is entitled to receive. *Sullivan v. Masters Jackson Paving Co.*, 35 S.W.3d 879, 888 (Mo.App.2001); *Mathia v. Contract Freighters, Inc.*, 929 S.W.2d 271, 277 (Mo.App.1996). In pertinent part, § 287.140.1 states that "the employee shall receive and the employer shall provide such medical, surgical, chiropractic, and hospital treatment, including nursing, custodial, ambulance and medicines, as may reasonably be required after the injury or disability, to cure and relieve from the effects of the injury." This includes treatment which gives comfort or relief from pain, even though a cure is not possible. *Sullivan*, 35 S.W.3d at 888; *Ford v. Wal–Mart Associates, Inc.*, 155 S.W.3d 824, 828–29 (Mo. App.2005). An employer's duty to provide statutorily-required medical aid to an employee is absolute and unqualified. *Jennings v. Station Casino St. Charles*, 196 S.W.3d 552, 557 (Mo.App.2006); *Wilson v. Emery Bird Thayer Co.*, 403 S.W.2d 953, 957 (Mo.App.1966). As a general rule, the employer is given control over the selection of the employee's medical providers. *Blackwell v. Puritan–Bennett Corp.*, 901 S.W.2d 81, 85 (Mo.App.1995). This principle, however, is subject to an important caveat. If the employer is on notice that the employee needs treatment and fails or refuses to provide it, the employee may select his or her own medical provider and hold the employer liable for the costs thereof. *Jones v. Dan D. Services, L.L.C.*, 91 S.W.3d 214, 220–21 (Mo.App.2002); *Sheehan v. Springfield Seed and Floral, Inc.*, 733 S.W.2d 795, 798 (Mo.App.1987); *Hawkins v. Emerson Electric Co.*, 676 S.W.2d 872, 880 (Mo.App.1984).

In urging reversal of the Commission's award, Employer first argues that it cannot be held liable for Martin's permanent total disability benefits because that condition was caused by medical treatment which Employer did not authorize. According to Employer, Missouri courts have never held an employer responsible for disability that resulted from unauthorized medical care. One of the cases cited by Employer to support that proposition is *Wilson v. Emery Bird Thayer Co.*, 403 S.W.2d 953 (Mo.App.1966). In point of

fact, this decision completely refutes Employer's argument.

In *Wilson*, the claimant injured her neck, arm and shoulder at work when she fell from her chair on April 27, 1964. At the employer's direction, claimant was sent to the company doctor, Dr. Flanders, for treatment. Claimant was then referred by Dr. Flanders to an orthopedic doctor, Dr. Barnard, who saw claimant on May 5th. As of May 20th, the employer cut off all medical treatment to claimant. Claimant continued to be treated by Dr. Barnard. On June 29th, he placed claimant in the hospital and treated her with traction. That traction treatment caused claimant to develop a temporomandibular joint (TMJ) condition in her jaw. *Wilson*, 403 S.W.2d at 955–56. The Commission found that claimant's TMJ directly resulted from her accident. She was awarded the expenses she incurred for treatment after her employer cut off medical aid, as well as temporary total disability benefits and permanent total disability benefits. *Id.* at 956. On appeal, the employer argued that it could not be held liable for claimant's TMJ condition because it resulted from medical treatment which the employer refused to provide. *Id.* at 958. The western district of this Court affirmed the Commission's award. The Court held that when an employee's original compensable injury is aggravated by medical or surgical treatment without fault on the employee's part, there is a sufficient causal connection to make the resulting disability compensable as well. *Id.* at 957. As the Court noted, the employer's refusal to authorize treatment "had no impingement or effect whatsoever on the physical aspects of causation here considered. The chain of causal events producing claimant's additional injuries was consecutive, uninterrupted and complete and did not include the employer's disclaimer of legal duty." *Id.* at 958. We agree with the reasoning in Wilson. Con-

sequently, Employer's first argument is meritless.

■  Employer next argues that Martin should not have been awarded permanent total disability benefits because "[t]he overwhelming evidence in this case demonstrates that the surgeries by Dr. Schoedinger were not reasonably required to cure and relieve the effects of the injury." We disagree.

As noted above, the Commission made a factual determination that Martin herniated discs in her back when she was injured at work and that Dr. Schoedinger's surgical treatment of those herniated discs was reasonable and necessary. In arguing that these findings are contrary to the overwhelming weight of the evidence, Employer relies upon the following: (1) Dr. Miller's diagnosis that Martin had a back strain; (2) the negative results of various diagnostic tests performed on Martin between February and April 1997; (3) Dr. Schoedinger's initial determination in May 1997 that Martin was not a surgical candidate; and (4) Dr. Wayne's testimony that Martin had only suffered a lumbar strain and did not need surgery. Employer, however, ignores the following evidence which tends to support the Commission's findings:

1. Martin's 2/10/97 CT scan, which one doctor had read as negative, was interpreted by Dr. Schoedinger as revealing an L5–S1 disc rupture.

2. After examining Martin on 2/24/97, Dr. Choudhary concluded that she might have a mild herniated disc.

3. After receiving all of the medical treatment Employer was willing to provide, Martin was only able to work 4–5 hours per day, the pain in her back was almost unbearable, and she was dragging her right leg.

4. After Martin's 5/5/97 office visit with Dr. Schoedinger, her symptoms worsened such that she was unable to sleep, sit longer than 30 minutes or do anything around the house.

5. After Dr. Hanaway examined Martin on 5/15/97, he advised her to stop working and scheduled EMG studies.

6. The results of the EMG studies were positive and demonstrated nerve root pressure in the right lower lumbar region, which was indicative of a ruptured disc.

7. During an examination by Dr. Schoedinger on 6/20/97, Martin exhibited classic symptoms of a ruptured disc and was told that her condition probably would not get any better without surgery.

8. During the first surgery on 7/10/97, Dr. Schoedinger found and removed a ruptured disc at the L5–S1 level that was causing pressure on a nerve root.

9. During the second surgery on 11/17/97, Dr. Schoedinger observed another central disc rupture at the L4–L5 level that was causing bilateral nerve root compression, which was relieved through the placement of fusion instrumentation.

10. As the result of undergoing these surgeries, Martin suffered much less frequent pain in her right leg and no longer dragged that limb.

11. Martin's continuing back pain is the result of nerve root irritation, which was caused by the development of considerable scar tissue in the area of her three surgeries.

■■■■ Employer and Martin presented the Commission with conflicting medical theories concerning the nature of the injury Martin sustained. It is well-settled that deciding which theory to accept "is a determination particularly for the Commission." *Aldridge v. Southern Missouri Gas Co.,* 131 S.W.3d 876, 882 (Mo.App.2004). The issue of what treatment was reasonably required to treat Martin's injury likewise presented an issue of fact to the Commission to decide. *See George v. City of St. Louis,* 162 S.W.3d 26, 30 (Mo.App. 2005). Given the conflict in the medical testimony, it was solely up to the Commission to weigh the evidence and assess the credibility of the witnesses. *See Marmon v. City of Columbia,* 129 S.W.3d 921, 927 (Mo.App.2004). The Commission found the testimony presented by Martin and Dr. Schoedinger to be credible, but decided that Dr. Wayne's testimony was unpersuasive.[4] On appeal, we do not reweigh the evidence; we simply determine as a matter of law "whether the Commission could have reasonably made its findings and reached its result upon consideration of the evidence before it." *Negri v. Continental Sales & Service,* 139 S.W.3d 565, 569 (Mo.App.2004). "Even if there is evi-

---

4. To decide whether the medical treatment provided by a physician met the applicable standard of care, an objective test is utilized. *See, e.g., Swope v. Printz,* 468 S.W.2d 34, 40 (Mo.1971) (an expert must incorporate the legal standard of care into his testimony to show that it is based upon an objective legal test, rather than the expert's own undisclosed subjective conception of acceptable medical standards); *Ladish v. Gordon,* 879 S.W.2d 623, 634–35 (Mo.App.1994) (an expert must employ the proper objective legal standard in his testimony); *Dine v. Williams,* 830 S.W.2d 453, 456 (Mo.App.1992) (same holding). In our view, the issue of what treatment "may reasonably be required" pursuant to § 287.140.1 must also be decided on an objective basis. In light of the purely subjective approach taken by Dr. Wayne, it is not surprising that the Commission found his testimony unconvincing.

dence that would support a contrary finding, this court should not substitute its opinion of the facts for that of the Commission." *Sartor v. Medicap Pharmacy,* 181 S.W.3d 627, 630 (Mo.App.2006).

Considering the record as a whole, there is competent and substantial evidence to support the Commission's decision that Martin sustained herniated discs in the accident, that Dr. Schoedinger's surgical treatment of those herniated discs was reasonable and necessary, and that Martin's permanent and total disability was the direct result of this course of treatment. Therefore, the Commission did nor err in awarding permanent total disability benefits to Martin. Employer's first point is denied.

In Employer's second point, it contends that the Commission erred in awarding Martin permanent total disability benefits because her disability resulted from an independent intervening cause attributable to her own intentional conduct. Employer argues that it should be relieved of financial responsibility for Martin's disability because it was her decision to undergo surgery. Based on the record before us, we find no merit in that assertion.

Martin was injured on January 20, 1997. Before deciding to have surgery, Martin had been treated conservatively for approximately five months. After receiving all of the treatment Employer was willing to provide, Martin was only able to work 4–5 hours per day, the pain in her back was almost unbearable, and she was dragging her right leg. By May 5th, she was unable to sleep, sit longer than 30 minutes or do anything around the house. By May 15th, she had been advised by Dr. Hanaway to stop working. By June 20th, Mar-

tin reached the point where she could no longer stand the pain in her back. She agreed to undergo a lumbar discectomy after being told by Dr. Schoedinger that her condition probably would not get any better without surgery.[5] As noted earlier, an employer has an absolute and unqualified statutory duty to provide an employee with treatment that gives comfort or relief from pain, even though a cure is not possible. § 287.140.1; *Ford v. Wal–Mart Associates, Inc.,* 155 S.W.3d 824, 828–29 (Mo. App.2005); *Sullivan v. Masters Jackson Paving Co.,* 35 S.W.3d 879, 888 (Mo.App. 2001). Martin's surgical treatment resulted in significant temporary pain relief and a permanent reduction in the pain she suffered in her right leg, as well as a restoration of function to that limb. Since Martin's permanent and total disability directly resulted from her surgical treatment by Dr. Schoedinger, "the chain of causal events producing [Martin's] additional injuries was consecutive, uninterrupted and complete...." *Wilson v. Emery Bird Thayer Co.,* 403 S.W.2d 953, 958 (Mo.App. 1966).

"In Missouri, where the primary injury is aggravated by medical treatment, without fault of the employee, there is a causal connection between the original injury and the resulting disability." *Jennings v. Station Casino St. Charles,* 196 S.W.3d 552, 557 (Mo.App. 2006). In our view, Martin's disability is not the result of any fault on her part. Once Employer refused or neglected to provide Martin with reasonable and necessary medical aid, she was free to procure such treatment on her own. *Wilson,* 403 S.W.2d at 957. The additional injuries that she sustained directly resulted from

---

5. In Dr. Schoedinger's deposition, he testified that conservative treatment would never have relieved Martin's symptoms. He also noted that orthopedic back surgery is almost never done on an emergency basis: "99.9% of the time, it's the patient who decides whether he is going to have surgery, and it's related to the patient's inability to live with the symptoms."

that reasonable and necessary course of medical treatment. Therefore, the Commission's decision to award Martin permanent and total disability benefits was not erroneous. Employer's second point is denied.

In Employer's third point, it contends the Commission erred in awarding Martin the cost of the medical treatment provided by Dr. Schoedinger and total temporary disability benefits because Employer did not authorize that care. We disagree.

Employer's medical aid to Martin ceased once she was examined by Dr. Miller on February 27, 1997. After that date, Martin experienced a significant increase in her symptoms. When Martin requested authorization to be treated by Dr. Schoedinger, Employer was placed on notice that Martin was in need of additional medical aid. There is competent and substantial evidence in the record to support the Commission's finding that additional medical aid was reasonably required to treat the herniated discs Martin had sustained in the accident. Employer refused to authorize Martin's treatment by Dr. Schoedinger and also failed to send Martin to any other physician for treatment. Under such circumstances, Martin was free to procure necessary treatment on her own and obtain an award against Employer for the reasonable cost thereof. *Id.* Employer stipulated that Dr. Schoedinger's charges were reasonable. Therefore, the Commission did not err in awarding Martin the cost of that medical treatment. *See Jones v. Dan D. Services, L.L.C.,* 91 S.W.3d 214, 220–21 (Mo.App. 2002); *Sheehan v. Springfield Seed and Floral, Inc.,* 733 S.W.2d 795, 798 (Mo.App. 1987); *Hawkins v. Emerson Electric Co.,* 676 S.W.2d 872, 880 (Mo.App.1984). As we have already held in addressing point two, Martin's disability was the direct result of the reasonable and necessary treat-

ment that she received from Dr. Schoedinger. Therefore, the Commission's award of temporary total disability benefits was also correct. *Wilson,* 403 S.W.2d at 957–58. Employer's third point is denied.

The Commission's award is affirmed.

SHRUM, SR. J., and GARRISON, J., Concur.