Ray D. REED, Respondent,

v.

ASSOCIATED ELECTRIC
COOPERATIVE, INC.,
Appellant,

and

Treasurer of the State of Missouri,
Custodian of the Second Injury
Fund, Respondent.

No. SD 29324.

Missouri Court of Appeals,
Southern District,
Division Two.

July 9, 2009.

Joseph M. Page, Jefferson City, for Appellant.

Ronald L. Little, Little, Schellhammer, Richardson & Knowlan Law Offices, P.C., for Respondent Ray Reed.

Jeremiah W. (Jay) Nixon, Atty. Gen., Frank A. Rodman, Asst. Atty. Gen., Jefferson City, for Respondent Second Injury Fund.

JOHN E. PARRISH, Judge.

Associated Electric Cooperative, Inc., (employer) appeals the Final Award Allowing Compensation of the Labor and Industrial Relations Commission (the commission). The commission found that Ray Reed (claimant) was permanently and totally disabled as a result of an injury sustained while working for employer; that the injury resulted from an accident that occurred September 26, 2001; that the injury was not the result of a pre-existing disability. This court affirms.

Claimant began working for employer in 1990. He worked as a utility operator, an auxiliary operator, a deck hand, and, finally, as a yard equipment operator. He began working as a yard equipment operator in 1994. He worked in that capacity until June 9, 2002. His duties as yard equipment operator involved operating heavy machinery including scrapers, dozers, trailer trucks, loaders, and backhoes.

On September 26, 2001, claimant was injured at work. He was loading coal in a scraper. He explained what happened:

> ... [W]hen I got to the bottom of the pile, I looked back and there was smoke rolling out of the rear engine. So I headed off, I kicked the gate open. I pulled the extractor, I extracted all the coal on the way to a water outlet. When I got to the water outlet, I got out of the scraper, I walked from the front of the scraper to the back of the scraper. I climbed up on top of the back of the scraper and shielding myself behind the radiator, I peered over into the engine to see what was happening. I seen a fuel line had—metal fuel line had broke and it was squirting diesel on to the engine and the smoke I was seeing was the diesel that was vaporizing. At that point it scared me pretty good because I could see some hot coal on edges around the engine.

Claimant was asked what he did. He answered:

> What I did was I bended down and grabbed ahold of this rod and I reached in to get the throttle level to kill the engine to kill the flow. As I did, I couldn't reach the lever so I pulled my body up with my right hand as I was reaching to the left and pushing forward with my right foot off of a piece of metal there. When I did, I reached the lever, my foot slipped off and I twisted my back. At that specific time it felt like I

have sprung my ankle. I went ahead, shut the engine down, I crawled down and I went and got the water hose trying to walk off what I thought was a sprained ankle.

Claimant went home, took a bath, and lay down. He began experiencing pain in his lower back and down his right leg to the top of his foot. This occurred on a Wednesday. Claimant was not scheduled to work the following Thursday or Friday. On Thursday he continued to experience pain down his right leg and lower back and foot. It was worse on Friday. Claimant stayed home on Friday and tried to rest in an attempt to be able to return to work on Saturday. On Saturday claimant called employer and reported that he was unable to work due to the accident he had at work the previous Wednesday. Claimant asked if employer wanted him to go to the company doctor. The safety coordinator told him to see whoever he wished.

Claimant sought treatment at the emergency room at Southeast Hospital in Cape Girardeau. He was examined, x-rayed, and given a prescription for medication. He was diagnosed as having acute paralumbar strain with muscle spasms and right leg radiculopathy. Claimant was told to see a "follow-up doctor" if he did not get better. Claimant did not feel better. He consulted Dr. Deborah Thomas. She examined claimant and ordered an MRI. The MRI revealed "mild multilevel changes with a small right foraminal disc extrusion at L4–5 involving the right L4 nerve root."

Employer arranged for claimant to see Dr. Scott Gibbs, a neurosurgeon. Dr. Gibbs examined claimant and reviewed the earlier MRI. His observation was that the MRI revealed a "broad-based disc bulge" at L4–5 and a "very slight broad-based disc bulge with no deformity of the exiting nerve roots" at L5–S1. He stated a diagnostic impression from the MRI findings of "a right L4–5 foraminal herniated nucleus pulposus and this is superimposed on lateral recess stenosis at this level." He stated the impression that claimant's lower extremity pain and paresthetic numbness and tingling appeared to follow an L5 dermatomal pattern. Dr. Gibbs prescribed medication and explained that should conservative management of claimant's condition fail, claimant might be a good candidate for surgery. Claimant was ordered to remain off work.

Claimant ultimately underwent surgery. Dr. Gibbs preformed lumbar surgery December 13, 2001—a bilateral interior L4 and superior L5 laminectomy and medial facetectomy with foraminotomy. Claimant continued to experience numbness in his right leg and foot after surgery.

Dr. Gibbs released claimant to return to work with restrictions on February 11, 2002. Claimant had a follow-up appointment with Dr. Gibbs on March 5, 2002. Claimant was still experiencing numbness in his right leg and calf. At work, he avoided heavy lifting or other duties that would put undue strain on his back. At the March 5 appointment, Dr. Gibbs found claimant at maximum medical improvement. He released claimant to return to work without restrictions and discharged claimant from his medical care.

Claimant's numbness in his right leg and foot gradually increased after returning to work. Use of his foot in operating machines and vibrations from the machines intensified his symptoms. He again developed lower back pain. He contacted Dr. Gibbs' office to request prescription medication. His request for medication was not granted, and Dr. Gibbs would not see claimant again unless a claim for a second injury was filed.

Claimant's pain and numbness progressively increased. On June 9, 2002, claimant told his supervisor of his discomfort and said he was going to talk to employer's yard superintendent. The supervisor told claimant not to talk to the superintendent but to see a doctor.

Claimant saw Dr. Kimberly Schisler on June 10, 2002. She took claimant off work. She provided claimant with a prescription for medication and ordered physical therapy. Claimant had follow-up visits with Dr. Schisler on June 17 and on July 1. There was no change in his symptoms. Dr. Schisler sent claimant for an MRI. After the MRI, she told claimant she thought the pain he was experiencing was associated with the September 26, 2001, injury. Dr. Schisler noted that claimant could not return to work due to his level of discomfort and numbness. She continued him off work until August 1, 2002.

Claimant reported the information to employer. He asked if they would provide additional treatment. Employer declined claimant's request for further treatment. Claimant was told to seek medical treatment on his own and use his medical insurance.

Claimant next contacted Dr. Alan Chen. After having examined and agreed to treat claimant, Dr. Chen referred claimant to Dr. Matthew Gornet, an orthopedic surgeon. Claimant first saw Dr. Gornet in September 2002. After reviewing Dr. Gibbs' treatment notes and the previous MRI results, Dr. Gornet had claimant undergo a CT-myelogram. Dr. Gornet concluded that claimant suffered from postdiscectomy back pain related to his initial September 26, 2001, work-related injury. He found claimant to be temporarily totally disabled. Dr. Gornet recommended a lumbar fusion as claimant's only option.

Surgery was scheduled consisting of two procedures "a couple or a day apart or a day between them." The surgery, however, was cancelled. Claimant explained what occurred after he returned from the appointment with Dr. Gornet:

When I got back home that afternoon, on my caller I.D., two hours and about 30 minutes later that [sic] my doctor's appointment with Dr. Gornet, Dr. Gibbs called and said workers' comp or his— not Dr. Gibbs personally, but his receptionist, that they wanted to line me up with some physical therapy.

Claimant cancelled his appointment with Dr. Gornet and took the physical therapy that Dr. Gibbs offered. Dr. Gibbs provided no treatment other than the physical therapy.

Claimant received treatment for about a month. It provided no relief. Dr. Gibbs then had claimant undergo a functional capacity test. The physical therapist who performed the test found that claimant displayed limited functional capacity, primarily secondary to subjective complaints of pain and inadequate functional range of motion and weakness. Claimant exhibited "severe over-guarding behaviors" that did not allow the therapist to complete portions of the evaluation involving repetitive tasks. Claimant could not tolerate extended periods of sitting, standing, or walking. He was unable to lift objects from the floor. The maximum lifting weight he could tolerate was nine pounds. The test verified that claimant could not meet the lifting and climbing requirements of his job.

Claimant did not hear back from Dr. Gibbs' office after the functional capacity evaluation. When he called Dr. Gibbs' office, he was told he had been released from the doctor's care. When he contacted employer, claimant was told employer was not providing further treatment. He then returned to Dr. Gornet. Claimant

informed Dr. Gornet that employer had denied further treatment. Dr. Gornet was also notified by employer's insurance carrier that further treatment would not be provided.

Dr. Gornet performed a two-part anterior and posterior lumbar interbody fusion at levels L2–5 to claimant's back on August 13 and 15, 2003. A CT scan indicated the procedure was successful. Claimant reported significant improvement following his surgery by Dr. Gornet. He stated he was walking better and taking minimal pain medication. Claimant reported some continued "burning" in both legs after prolonged periods of sitting or walking. Dr. Gornet attributed the burning, or numbness, to permanent nerve dysfunction.

Dr. Gornet released claimant "for sedentary work" as of February 23, 2004, with restrictions of no lifting greater than ten pounds, no repetitive bending, and the ability to alternate between sitting and standing at claimant's discretion. Dr. Gornet stated that claimant's work restrictions were permanent.

Claimant returned to Dr. Gornet for a follow-up visit in August 2005. At that time, Dr. Gornet suggested that claimant would not be able to complete an eight-hour workday, even with restrictions. His opinion was that claimant would not be able to return to gainful employment given his severe restrictions, symptoms, and education. Dr. Gornet saw claimant again in August 2006. Claimant reported that his symptoms had improved greatly since the surgery Dr. Gornet had performed, but he experienced pain when he was involved in significant activity. Dr. Gornet's opinion was that claimant's level of functioning at that time was permanent. He attributed claimant's symptoms to the September 26, 2001, injury.

Claimant continued to see Dr. Chen throughout 2005, 2006, and 2007. Dr. Chen's treatment of claimant was for depression, blood pressure, and pain management. Following the filing of his workers' compensation claim, claimant was evaluated by other physicians, a psychologist, and vocational experts.

The commission found that claimant sustained an accident and resulting injuries arising out of and in the course of his employment on September 26, 2001; that claimant is permanently and totally disabled as a result of that accident. The commission found that claimant had no disability pre-existing that date; that the September 26, 2001, injury was a substantial factor in causing claimant's low back injury, pain disorder, mood disorder, depression, resulting medical conditions, disability, and need for treatment from the date of the accident through March 5, 2002, and beginning again June 9, 2002. Claimant was found to be permanently and totally disabled. Claimant was awarded compensation in the amount of $220,935.48 representing $148,461.55 for previously incurred medical expenses; $72,323.50 for additional temporary total disability; and $150.43 for underpayment of temporary total disability.

On appellate review, a court must examine the whole record to determine if the Commission's award is supported by competent and substantial evidence. *Hampton [v. Big Boy Steel Erection,* 121 S.W.3d 220] at 222–223 [ (Mo.banc 2003) ]. In reviewing whether awards of the Commission are against the overwhelming weight of the evidence, the power of the court does not extend to reweighing the evidence. *Id.* Instead, the appellate court must determine whether the Commission could have reasonably made its findings and reached its result upon consideration of all of the evidence before it. *Totten v. Treasurer*

*of State,* 116 S.W.3d 624, 629 (Mo.App. E.D.2003).

Additionally, "findings of fact made by the [C]ommission within its powers shall be conclusive and binding." Section 287.495.1 [RSMo 2000]. Thus, we defer to the Commission on issues concerning credibility and the weight to be given conflicting evidence. *Totten* at 627. However, we independently review questions of law without deference to the Commission's findings. *Id.*

*Henley v. Tan Co., Inc.,* 140 S.W.3d 195, 198 (Mo.App.2004).

■ Employer's first point on appeal is directed to the commission's award of $148,461.55 for previously incurred medical expenses. Employer argues that the award "is erroneous and against the weight of the evidence in that the medical procedures were unauthorized and [claimant's] primary treating physician testified that the procedures were unnecessary and not medically warranted and therefore the employer had met its obligation and requirement of providing medical aid to cure and relieve the effects of the injury and its refusal to pay for unauthorized and ultimately unnecessary treatment was within its discretion."

Employer argues that Dr. Gibbs was claimant's primary treating physician; that Dr. Gibbs concluded that claimant had reached maximum medical improvement on March 5, 2003; that the medical care provided claimant after that date was for a nonwork-related degenerative condition. Employer contends that the medical care provided after that date by Dr. Gornet was, therefore, not compensable.

Claimant returned to work after Dr. Gibbs found that claimant had attained maximum medical improvement. Claimant was, however, still experiencing pain and numbness. Those symptoms increased to the point that, on June 9, 2003,

claimant could no longer perform his work duties. There was evidence that, notwithstanding the difficulty claimant continued to experience, Dr. Gibbs office refused to provide further treatment; that claimant was instructed to seek medical care using his personal medical insurance. Claimant did so and was referred to Dr. Gornet. Dr. Gornet provided medical care for claimant from September 2002 to August 2006, including performing a two-stage lumbar surgery in August 2003. Dr. Gornet testified that claimant's continued low back pain and lower right extremity numbness was related to the September 26, 2001, injury. He stated that the September 26, 2001, injury was a substantial factor with respect to claimant's need for the surgery he performed; that the medical treatment he provided claimant was medically necessary and reasonable.

The commission affirmed the award and decision of the administrative law judge. It attached the administrative law judge's award and decision and incorporated it by reference as part of the commission's Final Award Allowing Compensation. The decision addressed the necessity of the treatment provided claimant after Dr. Gibbs concluded that claimant had attained maximum medical improvement from the September 26, 2001, injury. It states:

It was Dr. Gornet's opinion that [claimant's] October 4, 2001 MRI showed disc protrusions and foraminal stenosis at L3–4, L4–5, and L5–S1. It was Dr. Gornet's opinion that the stenosis was made symptomatic due to the September 26, 2001 injury. It was Dr. Gornet's opinion that [claimant's] symptoms and problems were attributable and related to the September 26, 2001 back injury. Dr. Gornet stated that Dr. Gibbs' surgery at L4–5 initially helped him. [Claimant] continued to have numbness after Dr. Gibbs['] surgery

which gradually worsened. When Dr. Gornet saw [claimant] on September 9, 2002, it was [his] opinion that [claimant] suffered from post discectomy back pain and continued foraminal stenosis. The symptoms continued to be similar in nature and character to his original problem. Dr. Gornet stated that his diagnosis attributed the pain to his initial work injury and the continuation of the same problems....

Dr. Gornet testified that Dr. Gibbs' surgery only addressed the nerve compression but did not address the structural aspect of his spine. By removing the bone to help free up his nerves, it made the structure and the stability of the spine weaker. By not addressing the structural problem and making the spine structurally weaker or less stable, [claimant's] symptoms increased in severity. It was Dr. Gornet's opinion that it was the same problem the employee initially had from his September 26, 2001 injury, and his current symptoms were directly causally connected to that work related injury.

Dr. Gornet stated that his pre-surgery testing showed disc protrusions which are first grade disc herniations. It was his opinion that the only option for the employee was a fusion from L2–L5. During surgery for discogenic post discectomy low back pain, Dr. Gornet found a small central annular tear at L2–3; a central disc bulge and a small central disc herniation at L3–4; and a central annular tear and small central disc herniation at L4–5. The disc material that was mechanically injured at the time of his accident was removed. Dr. Gornet stated that the fusion did not extend to the L5–S1 level. It was Dr. Gornet's opinion that the injury of September 26, 2001 was a substantial factor if not the dominant factor in the need for the surgery he performed on [claimant]. It

was his opinion that all of the treatment that he provided was reasonable and necessary and related to the September 26, 2001 injury. It was Dr. Gornet's opinion that [claimant's] current symptoms were directly causally connected to his initial work related injury on September 26, 2001.

When asked if the fusion surgery by Dr. Gornet was the result of the an [sic] injury sustained at [employer], Dr. Gibbs answered that it was not an operation that he would have offered [claimant], and it was his opinion that the fusion surgery was not indicated. Dr. Gibbs stated that [claimant] did not realize any significant improvement in his symptoms as a result of the fusion and it was his opinion that the surgery did not help [claimant].

The commission accepted Dr. Gornet's opinion. It did not find Dr. Gibbs' assessment credible. Again, adopting the opinion of the administrative law judge, the commission concluded:

The evidence that Dr. Gornet's fusion surgery helped [claimant's] symptoms and condition is overwhelming. Dr. Gornet's medical records up to a year after the surgery show that [claimant's] back and leg symptoms were improved, he was walking better, was significantly improved from his preoperative state, and was grateful for the surgery and was pleased with his progress. Dr. Gornet's records at two and three years after the surgery noted that [claimant] was grateful for the help and he had definitely improved from the surgery. Medical records from a CT scan 6 months after surgery and from Dr. Chen's 8 months after the surgery, showed that his symptoms had improved, he was better, was able to walk and his back pain was reduced. [Claimant] testified that prior to Dr. Gornet's

surgery, he had extremely bad back pain with numbness and burning in his legs. He was in a deep, deep depression about his situation. The surgery by Dr. Gornet reduced his back pain and helped with his depression. [Claimant] stated Dr. Gornet "saved his life", helped with his pain and his life, and gave him hope. [Claimant's wife] testified that the surgery improved the condition of [claimant] and saved him.

Dr. Gornet's opinion was found more credible than the opinion of Dr. Gibbs regarding medical causation and regarding the appropriate treatment and surgery after June 9, 2002. "The weight to be given evidence rests with the Commission and it alone determines the credibility of witnesses." *Thornton v. Haas Bakery,* 858 S.W.2d 831, 833 (Mo.App.1993). "When there is competent evidence that conflicts, resolution of the conflict lies with the commission. Its choice is binding on this court." *Lingerfelt v. Elite Logistics, Inc.,* 255 S.W.3d 1, 6 (Mo.App.2008).

■ Claimant sought treatment from Dr. Gornet only after claimant requested that employer continue to provide treatment, but employer declined to do so. "If the employer is on notice that the employee needs treatment and fails or refuses to provide it, the employee may select his or her own medical provider and hold the employer liable for the costs thereof." *Martin v. Town and Country Supermarkets,* 220 S.W.3d 836, 844 (Mo.App.2007). That was the situation in this case.

A review of the whole record discloses that the commission's findings regarding employer's responsibility and liability for claimant's medical treatment following Dr. Gibbs' dismissal of claimant as his patient and its award for previously incurred medical expenses is supported by competent and substantial evidence. Point I is denied.

■ Point II contends the commission erred in awarding $72,323.50 for additional temporary total disability benefits; that "the decision is against the substantial weight of the evidence in that [claimant] had been released from authorized care and treatment and had reached maximum medical improvement on March 5, 2002, when he was released to return to work by Dr. Gibbs." Employer argues that the additional period for which compensation was awarded, from June 10, 2002, through August 23, 2004, was for a period of time during which "[claimant] was under the unauthorized care and treatment of Dr. Gornet and the employer had no notice nor reason to believe such care and treatment was necessary for [claimant's] work related injury."

As discussed in addressing Point I, claimant sought treatment from Dr. Gornet only after requesting that employer continue to provide treatment. Employer refused to provide that treatment, although, as the commission found, claimant was in need of additional treatment as a result of the September 26, 2001, work accident. The commission found that as a result of the September 26, 2001, accident, claimant was unable to continue his work during the time in question.

As discussed regarding Point I, claimant was entitled to procure independent medical care, as he did, when employer refused to provide the continued medical treatment that was needed. *Martin v. Town and Country Supermarkets, supra.* Employer had notice and reason to believe additional treatment was necessary. Having concluded that the award for additional medical care was warranted, it follows that the disability for which care was required, which resulted in claimant being unable to work, is, likewise, compensable.

The commission found, in adopting the award and decision of the administrative law judge, "that from June 10, 2002 through August 23, 2004, [claimant] was not able to return to work, had not reached the point where further progress was not expected, and no employer in the usual course of business would reasonably be expected to employ the claimant in his physical condition." *See Brookman v. Henry Transp.*, 924 S.W.2d 286, 290 (Mo. App.1996). It found that claimant was, therefore, entitled to temporary total disability for that period of time. The commission's finding is supported by competent and substantial evidence. Point II is denied.

■ Employer's Point III argues:

The Commission erred in awarding permanent and total disability benefits ... solely against the employer because "it is against the weight of the evidence in that both the employer's designated treating physician[,] Dr. Gibbs[,] and [claimant's] own expert[,] Dr. Gornet, testified that [claimant] could perform sedentary work with the ability to rise from the sedentary position and change positions frequently and the medical records and [claimant's] own testimony indicate that there was a second work related accident that should have shifted the burden of ongoing permanent and total disability benefits onto the Second Injury Fund.

The commission addressed the matter of claimant's total disability by adopting and incorporating the administrative law judge's determination in its final award. The testimony and medical reports of numerous experts who examined and treated claimant were reviewed in commendable detail in addition to the testimony of claimant, his wife, and son. The opinions of Dr. Gornet, Dr. Stillings, Dr. Cohen, Mr. Stock, and Mr. England were found more credible than the others who addressed the issue of disability.

The commission also concluded "that [claimant], his wife and son were very credible witnesses on the issue of permanent total disability."

Their testimony concerning the impact his injuries have had on [claimant's] daily ability to function either at home or in the work place. Their testimony in this regard is very credible and supports a conclusion that [claimant] will not be able to compete in the open labor market. With his physical and mental limitations, restrictions and pain it is extremely unlikely that any employer would reasonably be expected to hire [claimant] in his present physical and mental condition.

It found "that [claimant] is unable to compete in the open labor market and therefore is permanently and totally disabled." The commission further found:

Although [claimant] in this case had several pre-existing conditions including stenosis and sleep apnea, those conditions were asymptomatic, not disabling, and were not a hindrance or hindrance [sic] or obstacle to his employment or reemployment. The testimony of [claimant], his wife, and his son; and the credible medical and vocational evidence overwhelmingly support a finding that [claimant's] permanent total disability was caused solely by his September 26, 2001 injury. It is clear that he is [sic] not working is due to the severe pain he is experiencing in his low back and legs along with the depression that resulted from this severe pain which is all related to the September 26, 2001 accident alone and of itself.

The commission concluded that the Second Injury Fund had no liability.

Credibility of the testimony, including medical opinions, is for the commission's determination. *Lingerfelt v. Elite Logistics, supra*; *Gaston v. Steadley Co.*, 69 S.W.3d 158, 159 (Mo.App.2002). Considering the whole record, the determination that claimant is permanently disabled and that his disability was a result of the September 26, 2001, accident is supported by competent and substantial evidence. Point III is denied. The award of the commission is affirmed.

LYNCH, C.J., and RAHMEYER, J., concur.