

# SUPREME COURT OF MISSOURI
## en banc

| | | |
|---|---|---|
| CARL GREER, | ) | |
| Appellant/ | ) | |
| Cross-Respondent, | ) | |
| | ) | |
| vs. | ) | No. SC94724 |
| | ) | |
| SYSCO FOOD SERVICES, | ) | |
| | ) | |
| Respondent/ | ) | |
| Cross-Appellant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| TREASURER OF MISSOURI AS | ) | |
| CUSTODIAN OF THE SECOND | ) | |
| INJURY FUND, | ) | |
| | ) | |
| Respondent. | ) | |

**APPEAL FROM THE LABOR AND INDUSTRIAL RELATIONS COMMISSION**

*Opinion issued December 8, 2015*

Carl Greer (hereinafter, "Greer") appeals the Labor and Industrial Relations Commission's (hereinafter, "the commission") decision denying him permanent total disability ("PTD") benefits because he contends that, after he sustained a crush injury to his left ankle, he is unemployable in the open labor market. Greer's employer, SYSCO Food Services (hereinafter, "Employer"), cross-appeals, arguing the commission erred in

awarding Greer an additional award of temporary total disability ("TTD") benefits after Greer reached maximum medical improvement, erred in failing to reduce Greer's benefits due to an alleged safety violation, and erred in awarding Greer future medical care benefits. After examining the evidence in the context of the whole record, this Court holds the commission's decision is supported by substantial and competent evidence. The commission's decision is affirmed.

## Factual and Procedural History

Greer began working for Employer in 1989. Greer first worked in Employer's warehouse as an order filler, then was promoted to forklift operator. The operator position required Greer to stand between eight and twelve hours a day, to climb in and out of a forklift, and to maneuver the forklift. Greer repetitively lifted heavy objects and engaged in pushing, pulling, overhead reaching, stooping, squatting, and using his upper body throughout the work day. Greer sustained several work-related injuries prior to the crush injury to his ankle, including a bulging disc in his cervical spine, a lower lumbar strain, and a rotator cuff injury to his right shoulder.

On February 23, 2006, Greer was standing on a stationary forklift inside a freezer at the warehouse attempting to scan a pallet containing inventory. Greer's scanner gun malfunctioned, requiring him to lean forward to scan the pallet. As Greer leaned forward, his left leg extended outside the running lines of his forklift. At that moment, a co-employee driving another forklift caused the other forklift to grab Greer's left foot and crush it between the two forklifts. Greer was taken by ambulance to the hospital, and his left foot was placed in a cast.

Five days after the accident, Greer saw Dr. Blair, an orthopedic surgeon, who diagnosed Greer with a crush injury to his left ankle.  Dr. Blair treated Greer for several months, prescribing pain medication, ordering physical therapy, and monitoring his recovery.  Greer participated in two functional capacity evaluations while under Dr. Blair's care.  The first evaluation, conducted in August 2006, showed Greer could work at the heavy demand level.  Greer was released to return to work at that time.  However, Greer began experiencing difficulty working and in October 2006 underwent a second functional capacity evaluation, which determined he could work at a medium demand level.

In February 2007, Dr. Blair noted tenderness over Greer's tarsal tunnel and ordered Greer to undergo an electromyogram and nerve conduction test.  Dr. Blair noted the electromyogram was normal, but Greer could not complete the nerve conduction test due to pain intolerance.  After ordering Greer to undergo additional work hardening, Dr. Blair released Greer to full duty in March 2007.  Greer last saw Dr. Blair on April 23, 2007, at which time Dr. Blair released Greer at maximum medical improvement and opined Greer sustained a five percent permanent partial disability of his left ankle due to a limited range of motion.

Greer attempted to return to work several times after being released to full duty. In July 2007, Greer visited Dr. Grebing, who diagnosed Greer with a left ankle and foot crush injury and left tarsal tunnel syndrome.  Dr. Grebing administered a cortisone injection to provide Greer relief.  However, Greer found he was unable to perform his job duties and voluntarily resigned his employment on November 7, 2007.  Employer did not

3

authorize or pay for any further medical treatment after Greer voluntarily terminated his employment.

Because Greer continued to have issues with his left foot, he sought treatment on his own, first consulting with a pain management specialist, Dr. Graham, in November 2007. Dr. Graham administered a psychological evaluation as part of his examination. Dr. Graham found Greer had symptoms of possible tarsal tunnel syndrome. However, Dr. Graham concluded Greer had a strong likelihood of functional overlay, wherein a patient's subjective complaints are disproportionate to the objective medical findings and are recalcitrant to treatment. Based on this finding, Dr. Graham did not offer Greer any pain management treatment and did not recommend Greer undergo surgery or any other invasive treatment.

Between November 2007 and December 2009, Greer engaged in physical therapy and various treatments with at least five physicians, all whom diagnosed Greer with tarsal tunnel syndrome. In December 2009, Greer consulted with Dr. Johnson, an orthopedic surgeon, about the pain in his left foot and ankle. Dr. Johnson initially diagnosed Greer with a fixed deformity in his left foot, which caused his foot to turn inward, and possible tarsal tunnel syndrome. Dr. Johnson ordered additional tests and referred Greer to Dr. Mackinnon, a plastic surgeon, to evaluate his nerve pain. Dr. Johnson eventually recommended Greer undergo tarsal tunnel release surgery, wherein the goal of the surgery would be to reduce Greer's nerve pain and correct his foot deformity.

On June 22, 2010, Drs. Johnson and Mackinnon performed a tarsal tunnel release, tendon lengthening, removal of cutaneous neuromas, and internal neurolysis.

4

Dr. Johnson found the nerve pain Greer described was consistent with the nerve damage he observed during the tarsal tunnel surgery. Dr. Johnson believed the damage inside Greer's foot could be caused by trauma or a crush injury. Dr. Johnson treated Greer for several more months while Greer recovered from the surgery. Although Greer gained some improvement in his foot positioning, his foot eventually contracted to an inward position and he continued to have nerve pain. Dr. Johnson thought a tendon transfer might be Greer's next treatment option for the foot deformity, but he believed Greer's primary problem was pain-related. Dr. Johnson recommended future pain management for Greer's neurogenic pain. Dr. Johnson released Greer from his care on February 4, 2011.

Dr. Berkin, a family physician, conducted three independent medical examinations of Greer, occurring in August 2007, January 2009, and March 2011. Dr. Berkin also reviewed Greer's medical records and interviewed him to obtain his medical history. Dr. Berkin opined Greer suffered a crush injury to his left ankle and tarsal tunnel syndrome as a result of the work-related accident. Dr. Berkin placed restrictions on Greer to avoid the following: excessive squatting, kneeling, stooping, turning, twisting, lifting and climbing, standing on his feet for longer than twenty to thirty minutes, climbing ladders and stairs, working at heights above ground level, walking on uneven surfaces, lifting with his right arm extended from his body, and excessive lifting or working with his right arm above shoulder level. Dr. Berkin imposed other lifting restrictions and stated Greer should pace himself and take frequent breaks. Dr. Berkin stated these restrictions were based upon a combination of all of Greer's work-related

injuries. Dr. Berkin opined Greer was permanently and totally disabled due to all of his injuries. With respect to Greer's tarsal tunnel surgery, Dr. Berkin found Greer did not have a good outcome from the surgery because his functioning was not improved and his condition worsened after surgery.

Dr. Schmidt, an orthopedic surgeon, conducted two independent medical evaluations of Greer on Employer's behalf in February 2008 and May 2011. Dr. Schmidt also reviewed Greer's medical records and obtained a medical history from him. Dr. Schmidt opined Greer suffered a five percent permanent partial disability in his left foot, and agreed with Dr. Blair that Greer achieved maximum medical improvement on April 23, 2007. Dr. Schmidt's opinion did not change after Greer had tarsal tunnel surgery. Dr. Schmidt opined the tarsal tunnel surgery was not reasonably necessary and further surgical intervention would have a predictably poor result.

Greer filed an initial claim for workers' compensation benefits against Employer and the Second Injury Fund (hereinafter, "the Fund") for his ankle injury in December 2006 and filed an amended claim in March 2013. The parties could not reach a settlement and requested a hearing. The parties asked the administrative law judge (hereinafter, "the ALJ") to resolve the following issues: (1) medical causation; (2) liability for past medical expenses; (3) future medical care; (4) temporary disability; (5) permanent disability; (6) the Fund's liability; (7) penalties for safety violations; and (8) the date of maximum medical improvement.

At the hearing held on May 7, 2013, Greer testified about his subjective complaints stemming from the February 2006 accident. Greer indicated he walks with a

6

cane for support due to balance issues and has to wear special shoes. Greer stated he can stand approximately fifteen to twenty minutes at a time without assistance, and, occasionally, he can do so for longer periods. Greer testified he has pain in his left foot on a daily basis, and any activity involving his left foot causes that foot to swell. When his foot swells, Greer stated that he needs to elevate his foot for one to two hours. Greer wanted additional treatment because his left foot is deformed and disfigured and he is in constant pain. Greer testified he could not work full-time and his prior injuries hindered his work performance, causing him to miss work occasionally.

Greer's supervisor, Barry Flakes (hereinafter, "Flakes"), testified regarding Employer's preferred work method safety rules, which are discussed at daily pre-shift meetings and distributed to each employee. Greer received and signed a copy of the safety rules. At issue here is safety rule #3, under the "Traveling" section, which states, "Keep all body parts inside the running lines of the equipment." Flakes testified that safety rule #3 applied even when the forklift is not in motion. Flakes further explained that he performed daily hazard assessments of warehouse employees and performed "coaching" sessions to correct employees who were found to have violated the rules.

Flakes conducted the investigation of Greer's accident, and he completed the accident report and a counseling form. The counseling form stated, "On 2/23/06 you were involved in an accident in the freezer. This accident could have been prevented if the following preferred work methods for safety would have been followed: Under Traveling #3 Keep all body parts within the running lines of the equipment." Flakes

7

stated that while the co-employee caused the accident by violating various safety rules, Greer caused his ankle injury by violating safety rule #3.

Less than two weeks after the accident, Flakes asked Greer to sign the counseling form. Greer signed the form and did not tell Flakes he thought safety rule #3 only applied when the equipment was in motion. Greer testified at the hearing that he did not believe he violated safety rule #3 because the rule only applied when the forklift was traveling. Greer did not explain this to Flakes at this time he signed the counseling form because he had "several other issues going on with [Employer] at the time" related to obtaining medical treatment for his injury.

Employer also offered into evidence video surveillance taken of Greer in February 2008 and August 2012. The video surveillance demonstrated Greer could walk up and down stairs without much difficulty, lean forward and put pressure on his left foot, drive a truck, and stand outside speaking to his neighbors for longer than twenty minutes. The video surveillance also showed Greer did not always use a cane.

The ALJ received the reports and deposition testimony of two vocational rehabilitation counselors, Stephen Dolan (hereinafter, "Dolan") and Terry Cordray (hereinafter, "Cordray"). Dolan testified on Greer's behalf. Dolan performed a vocational assessment, which included reviewing Greer's medical records, obtaining Greer's educational and work history, interviewing Greer and conducting vocational testing. Dolan observed that Greer walked with a cane and wore a brace on his ankle during the assessment. Dolan opined that Greer was permanently and totally disabled based on Greer's primary and preexisting injuries, his work restrictions, functional

8

limitations, and his subjective complaints. When forming his opinion about Greer's employability, Dolan took into account Greer's reported complaint that he has to lie down one to two hours per day and all of Dr. Berkin's restrictions.

Cordray testified on behalf of Employer and the Fund. Cordray did not examine or interview Greer personally but testified that he had sufficient information to render an opinion about Greer's employability after his injury. Cordray examined Greer's medical records, the functional capacity examinations, educational and previous work background, and took into account Dr. Berkin's restrictions. While Cordray conceded Greer could not return to his position as a forklift operator, Cordray opined Greer could perform jobs that are sedentary, do not require more than a high school education, and do not require standing for more than twenty to thirty minutes at a time. Cordray admitted that if he took into consideration Greer's subjective complaint about needing to lie down and rest throughout the day, Greer would be unemployable. However, Cordray discounted Greer's subjective complaint because no objective medical evidence or medical provider required Greer to do so. Cordray explained that because the sedentary jobs he recommended are not exertional, Greer would not need to pace himself or take frequent breaks to avoid exacerbation of his symptoms. Cordray concluded that Greer was not permanently and totally disabled from either the ankle injury alone or from a combination of his ankle and preexisting injuries.

The ALJ issued its decision on July 5, 2013, and ruled in Greer's favor on the issue of medical causation and liability for past medical expenses. The ALJ determined Greer reached maximum medical improvement on April 23, 2007, and, therefore, was not

9

entitled to any TTD benefits beyond that date. The ALJ found Greer was not permanently and totally disabled but determined Greer was 27.5 percent permanently and partially disabled as a result of the accident. Finally, the ALJ reduced Greer's total benefit award by twenty-five percent due to Greer's violation of safety rule #3.

Greer filed an application for review, claiming the ALJ erred in: (1) limiting future medical treatment; (2) denying a claim for additional TTD benefits; (3) assigning only 27.5 percent disability to his left ankle; (4) denying a claim for PTD benefits; (5) imposing a safety penalty against him; and (6) applying the penalty to amounts representing past medical expenses awarded. Employer also filed an application for review, alleging the ALJ erred in: (1) admitting Dr. Johnson's opinion on causation; (2) awarding past medical expenses incurred after Greer reached maximum medical improvement; (3) awarding future medical benefits; and (4) failing to reduce Greer's benefits by a larger percentage for his alleged violation of safety rule #3.

On March 28, 2014, the commission modified the ALJ's award on the issues of TTD benefits, past medical expenses, and the reduction of benefits for a safety violation. The commission determined Greer was entitled to an additional award of TTD benefits and for past medical expenses that were overlooked in the record. The commission also overturned the ALJ's findings invoking the safety penalty. The commission affirmed the remainder of the ALJ's findings. Greer and Employer both appealed the commission's decision. After the court of appeals issued its opinion, it sustained Greer's application for transfer to this Court. Mo. Const. art. V, sec. 10.

## Standard of Review

A reviewing court may modify, reverse, remand for rehearing, or set aside a workers' compensation award upon a finding that: (1) the commission acted without or in excess of its powers; (2) the award was procured by fraud; (3) the commission's factual findings do not support the award; or (4) there was not sufficient competent evidence in the record to warrant the making of the award. Section 287.495.1, RSMo 2000.[1] "Whether the award is supported by competent and substantial evidence is judged by examining the evidence in the context of the whole record. An award that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence." *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 223 (Mo. banc 2003).

In the absence of fraud, the commission's findings of fact shall be conclusive and binding. Section 287.495.1. This Court must defer to the commission's findings on issues of fact, the credibility of the witnesses, and the weight given to conflicting evidence. *Treasurer of State-Custodian of Second Injury Fund v. Witte*, 414 S.W.3d 455, 460 (Mo. banc 2013). Questions of law are reviewed *de novo*. *Pierce v. BSC, Inc.*, 207 S.W.3d 619, 621 (Mo. banc 2006). This Court is not bound by the commission's interpretation and application of the law, and no deference is afforded to those determinations. *Gervich v. Condaire, Inc.*, 370 S.W.3d 617, 620 (Mo. banc 2012).

---

[1] Unless otherwise indicated, all statutory references are to RSMo 2000 as updated through the 2012 Supplement.

**Permanent Total Disability Benefits**

In Greer's sole point on appeal, he argues the commission erred in denying him PTD benefits because the overwhelming weight of the evidence presented from the witnesses and supported by the medical records demonstrated he was permanently and totally disabled. Employer and the Fund contend the commission's decision is supported by competent and substantial evidence, and Greer is asking this Court to reweigh the commission's credibility determinations.

Section 287.020.6 defines "total disability" as the "inability to return to any employment and not merely [the] inability to return to the employment in which the employee was engaged at the time of the accident." "The test for permanent total disability is the worker's ability to compete in the open labor market because it measures the worker's potential for returning to employment." *Tilley v. USF Holland Inc.*, 325 S.W.3d 487, 491 (Mo. App. E.D. 2010). "The ability to compete in the open labor market hinges on whether, in the ordinary course of business, any employer would be reasonably expected to hire the individual given his or her present physical condition." *Archer v. City of Cameron*, 460 S.W.3d 370, 375 (Mo. App. W.D. 2015). "Employability is a matter within the [c]ommission's expertise …." *Stewart v. Zweifel*, 419 S.W.3d 915, 918 (Mo. App. S.D. 2014). Greer bears the burden of proving he is entitled to PTD benefits. *Lewis v. Kansas Univ. Med. Ctr.*, 356 S.W.3d 796, 800 (Mo. App. W.D. 2011).

Greer relies heavily on the testimony of Dr. Berkin and Dolan to support his argument that he is entitled to PTD benefits. However, the commission found Greer failed to prove he was entitled to PTD benefits as a result of the ankle injury alone. The

12

commission noted Dr. Berkin's testimony unequivocally opined that Greer was permanently and totally disabled due to his ankle injury in combination with the disabilities imposed by his previous back, neck, and right shoulder injuries. The commission discounted Dolan's testimony that if Greer were required to elevate his foot for several hours a day, this condition alone would render him unemployable in the open labor market. The commission further found no medical provider imposed a restriction regarding Greer's need to elevate his foot throughout the day. The commission explained that Dolan based his opinion, in part, on Dr. Berkin's work restrictions, which were in turn based on a combination of Greer's injuries, not the ankle injury alone.

The commission next found Greer failed to prove he was permanently and totally disabled based upon all of his injuries. The commission relied on Cordray's testimony that Greer was not permanently and totally disabled because Greer was capable of working in sedentary jobs, which were not exertional, and that required no more than a high school education. The commission also relied on the video surveillance footage that showed Greer walking, climbing stairs, leaning on his left foot, standing, and driving. The commission found the video surveillance cast doubt on Greer's credibility about his subjective complaints. The commission concluded the credible evidence demonstrated Greer was not entitled to PTD benefits.

Greer argues the video surveillance was a "brief snapshot in time" and did not contradict his testimony that he cannot stand eight hours per day, has balance issues, and needs assistance to walk or stand. Further, Greer argues Cordray's opinion should be disregarded in favor of Dolan's opinion because Cordray ignored his self-professed best

13

practices by failing to meet with Greer to view and assess him personally and failed to take into account all of Greer's circumstances.

This Court "may not substitute its judgment on the evidence," and when the "evidence before an administrative body would warrant either of two opposed findings, the reviewing court is bound by the administrative determination, and it is irrelevant that there is supportive evidence for the contrary finding." *Hornbeck v. Spectra Painting, Inc.*, 370 S.W.3d 624, 629 (Mo. banc 2012) (quoting *Pulitzer Pub. Co. v. Labor & Indus. Relations Comm'n*, 596 S.W.2d 413, 417 (Mo. banc 1980)). Ultimately, Greer's position challenges witness credibility and the weight to be given to conflicting evidence. This Court must give deference to the commission's findings on these factual issues. *Id*. at 629. It was within the commission's prerogative to discount Dolan's testimony because it was premised upon Dr. Berkin's restrictions and Greer's subjective complaints that the commission did not find credible when compared with the video surveillance footage. Moreover, Cordray was clear that he disregarded Greer's subjective complaints, and even taking into account Dr. Berkin's restrictions, Cordray stated there were jobs available in the open market for which Greer qualified. The commission did not err in failing to award Greer PTD benefits.

### Temporary Total Disability Benefits

Employer raises three issues in its cross-appeal. In its first issue, Employer argues the commission erred in awarding Greer TTD benefits because section 287.149 does not allow for a TTD award beyond the date a claimant reaches maximum medical improvement. Employer alternatively argues the record does not contain substantial and

14

competent evidence to support a TTD award beyond April 23, 2007, because Greer was not engaged in the rehabilitative process when he had tarsal tunnel surgery in June 2010.

*Maximum Medical Improvement*

Employer argues the commission improperly awarded Greer an additional period of TTD benefits from June 22, 2010, through February 4, 2011, after Greer's tarsal tunnel surgery, because Drs. Blair and Schmidt opined Greer achieved maximum medical improvement on April 23, 2007. Employer further contends that because the commission did not overrule the ALJ's finding that maximum medical improvement occurred on that date, this factual finding conflicts with an award of TTD benefits beyond that date. Greer argues the term "maximum medical improvement" is not contained within chapter 287 and, therefore, it cannot be used to mandate the denial of benefits when strictly construing the workers' compensation statutes.

"Workers' compensation law is entirely a creature of statute, and when interpreting the law the court must ascertain the intent of the legislature by considering the plain and ordinary meaning of the terms and give effect to that intent if possible." *Templemire v. W & M Welding, Inc.*, 433 S.W.3d 371, 381 (Mo. banc 2014) (quoting *Greenlee v. Dukes Plastering Serv.,* 75 S.W.3d 273, 276 (Mo. banc 2002)). If a statute's language is unambiguous, this Court "must give effect to the legislature's chosen language." *State ex rel. Young v. Wood*, 254 S.W.3d 871, 873 (Mo. banc 2008). Only when the language is ambiguous will the Court resort to other rules of statutory construction. *Goerlitz v. City of Maryville*, 333 S.W.3d 450, 455 (Mo. banc 2011). "There is no need to resort to statutory construction to create an ambiguity where none

15

exists." *State v. Moore*, 303 S.W.3d 515, 521 (Mo. banc 2010).[2] "Temporary total disability or temporary partial disability benefits shall be paid throughout the rehabilitative process." Section 287.149.1. Section 287.020.6 defines "total disability" as the "inability to return to any employment and not merely [the] inability to return to the employment in which the employee was engaged at the time of the accident." "Temporary" and "rehabilitative process" are not defined in chapter 287. "Absent a statutory definition, words used in statutes are given their plain and ordinary meaning with help, as needed, from the dictionary." *Am. Healthcare Mgmt., Inc. v. Dir. of Revenue*, 984 S.W.2d 496, 498 (Mo. banc 1999). The dictionary defines "temporary" as "lasting for a time only; existing or continuing for a limited time; impermanent…." WEBSTER'S THIRD NEW INT'L DICTIONARY 2353 (1993). "Rehabilitate" means "to restore to a condition of health or normal activity by a process of medical rehabilitation." *Id*. at 1914. "Process" is defined as "a progressive forward movement from one point to another on the way to completion." *Id*. at 1808. An employer's obligation to pay TTD benefits shall not extend beyond 400 weeks during the continuance of such disability. Section 287.170. This section was intended to provide a sufficiently long period of time for the commission to evaluate the extent and nature of a claimant's injuries before making a final award while also affording the injured employee some compensation

---

[2] This Court recognizes section 287.800.1 requires that all workers' compensation statutes are to be construed strictly. However, this Court need only apply strict construction when the statute's language is ambiguous and this Court requires guidance in ascertaining the legislature's intent. Here, section 287.149's plain and ordinary meaning is apparent, and the requirement that the statute be construed strictly does not affect the analysis.

through TTD benefits. *Caldwell v. Melbourne Hotel Co.*, 116 S.W.2d 232, 239-40 (Mo. App. 1938).[3]

"Temporary disability awards are intended to cover a healing period." *Williams v. Pillsbury Co.*, 694 S.W.2d 488, 489 (Mo. App. E.D. 1985). TTD benefits "should be awarded only for the period before the employee can return to work." *Cooper v. Med. Ctr. of Independence*, 955 S.W.2d 570, 575 (Mo. App. W.D. 1997) (overruled on other grounds by *Hampton*, 121 S.W.3d at 224). A temporary award is not "intended to encompass disability after the condition has reached the point where further progress is not expected." *Williams*, 694 S.W.2d at 489. "This is reflected in the language that a temporary total disability lasts only 'during the continuance of such disability.'" *Cardwell v. Treasurer of the State of Missouri*, 249 S.W.3d 902, 909 (Mo. App. E.D. 2008) (quoting section 287.170.1).

Both parties acknowledge the commission's authority to award TTD benefits is limited to the express provisions of sections 287.149 and 287.170. However, Employer urges this Court to look beyond these plainly expressed provisions to apply the concept of maximum medical improvement to determine when Greer's disability ceased being temporary and became permanent.

Courts have used different terms to delineate when a claimant's condition has reached the point when further progress is not expected. *See e.g. Cooper*, 955 S.W.2d at

---

[3] The portion of the *Caldwell* opinion addressing the remand of the case was later quashed in *State ex rel. Melbourne Hotel Co. v. Hostetter*, 126 S.W.2d 1189 (Mo. banc 1939). However, this Court explicitly affirmed *Caldwell*'s analysis of the workers' compensation statutes at issue. *Id*. at 1190-92.

575 (holding TTD benefits are owed until the medical condition has reached the point of "maximum medical progress"). Another common term is "maximum medical improvement," which is not contained in chapter 287 but was coined in *Vinson v. Curators of Univ. of Missouri,* 822 S.W.2d 504 (Mo. App. E.D. 1991). In *Vinson*, the court adopted the commission's interpretation of a medical provider's opinion about a claimant's "maximum treatment potential" to mean the claimant reached "maximum medical improvement" and awarded TTD benefits for the period leading up to that date. *Vinson*, 822 S.W.2d at 508. The court found the commission's interpretation was "reasonable, and, thus, we have no permissible grounds for substituting another interpretation for it." *Id*. Since *Vinson*, the commission and the appellate courts have relied upon the date of maximum medical improvement to determine when a condition becomes permanent and TTD benefits terminate.

Reliance on the maximum medical improvement date was challenged in 2008 in *Cardwell*. In *Cardwell*, the claimant contended that maximum medical improvement should not be the date permanent partial disability benefits begin, particularly in cases in which the employee did not receive TTD benefits while he or she was being treated and recovering from a work-related injury. *Cardwell*, 249 S.W.3d at 909. The claimant further argued that because maximum medical improvement was not mentioned in the statutes as a prerequisite for payment, she believed permanent partial disability benefits should be paid as of the date of the injury in instances in which TTD benefits were not paid. *Id*. at 911.

The court of appeals rejected this argument. First, the court explained, "Although the statutes involving temporary total disability and permanent disability do not set out a specific time line, there is an intended timing of benefits paid by employers. Temporary total disability benefits are due from the date of the injury through the date the condition has reached the point where further progress is not expected." *Id*. at 910. The court reasoned, "One cannot determine the level of permanent disability associated with an injury until it reaches the point where it will no longer improve with medical treatment." *Id*. The court concluded, "Although the term maximum medical improvement is not included in the statute, the issue of whether any further medical progress can be reached is essential in determining when a disability becomes permanent and thus, when payments for permanent partial or permanent total disability should be calculated." *Id*.

Employer relies on *Cardwell* to support its argument that maximum medical improvement comes within the scope of the plain meaning of section 287.149, and the commission's rejection of it was erroneous in light of *Cardwell*'s holding. Employer argues that the legislature was aware the commission and courts were relying on the date of maximum medical improvement to determine when to terminate TTD benefits, and had the legislature wished to have that not be the case, it could have amended the statutes accordingly. Conversely, Greer argues that had the legislature wished to have the date of maximum medical improvement be the absolute date when TTD benefits terminate, it would have stated this explicitly in the statutes.

This Court agrees with the holding in *Cardwell* that the commission must decide whether any further medical progress can be reached because that decision is essential in

19

determining when a disability becomes permanent for the purpose of awarding permanent partial or PTD benefits. However, Employer's reading of *Cardwell* to *mandate or require* the commission to accept an opinion regarding the date of maximum medical improvement is incorrect.

The plain language of section 287.149.1 does not mandate the commission arbitrarily rely on the maximum medical improvement date to deny TTD benefits, if the claimant is engaged in the rehabilitative process. Instead, whether a claimant is engaged in the rehabilitative process is the appropriate statutory guidepost to determine whether he or she is entitled to TTD benefits under the plain language of section 287.149.1. It is plausible, and likely probable, that the maximum medical improvement date and the end of the rehabilitative process will coincide, thus, marking the end of the period when TTD benefits can be awarded. However, when the commission is presented with evidence, as here, that a claimant has reached maximum medical improvement yet seeks additional treatment beyond that date for the work-related injury in an attempt to restore himself or herself to a condition of health or normal activity by a process of medical rehabilitation, the commission must make a factual determination as to whether the additional treatment was part of the rehabilitative process. If the commission determines the additional treatment was part of the claimant's rehabilitative process, then he or she is entitled to TTD benefits pursuant to section 287.149.1 until the rehabilitative process is complete. Once the rehabilitation process ends, the commission then must make a determination regarding the permanency of a claimant's injuries.

While not common, courts have awarded a claimant two separate periods of TTD benefits stemming from the same work-related injury, even in instances in which the claimant has been declared to be at maximum medical improvement. In *Thorsen v. Sachs Electric Co.*, 52 S.W.3d 611 (Mo. App. W.D. 2001) (overruled on other grounds by *Hampton*, 121 S.W.3d at 224), the claimant was injured at work, underwent treatment, and was declared to be at maximum medical improvement, at which time his TTD benefits were terminated. *Thorsen*, 52 S.W.3d at 615. However, the claimant's conditioned worsened, and he sought treatment on his own after his employer refused to authorize additional care. *Id*. The claimant later underwent surgery, which improved his condition. *Id*. at 616. The claimant sought, and was awarded, an additional award of TTD benefits for the time he missed from work while recovering from the surgery. *Id*. at 621. The court affirmed the award on appeal because the claimant demonstrated he continued working toward attaining maximum medical improvement during the periods for which the commission awarded TTD benefits. *Id*. at 622.

Similarly, in *Reed v. Associated Elec. Co-op., Inc.*, 302 S.W.3d 693 (Mo. App. S.D. 2009), the claimant sustained a work-related injury, underwent surgery, and was released at maximum medical improvement. *Reed*, 302 S.W.3d at 695. The claimant's condition worsened and he pursued treatment on his own after his employer declined his request for further treatment. *Id*. at 696. The claimant underwent a second surgery and more treatment, which improved the claimant's condition but did not enable him to return to work. *Id*. at 698. The claimant received an additional award of TTD benefits for the period between the second surgery and his release date from medical care. *Id*. at 700.

21

The court, in affirming the award, rejected the employer's argument that the claimant underwent unauthorized care and treatment and that it had no notice or reason to believe the treatment was necessary for the work-related injury. *Id.*

This Court is not eliminating the concept of maximum medical improvement from the workers' compensation lexicon. This Court recognizes that the date of maximum medical improvement could aid the commission in determining the time when a disability becomes permanent and TTD benefits should be terminated. However, this Court holds the commission is not *required* to accept maximum medical improvement as a bright-line date to terminate TTD benefits when there is substantial and competent evidence presented that a claimant continues to be engaged in the rehabilitative process beyond a date initially believed to be the end of the rehabilitative process. Cases that hold to contrary should no longer be followed.

Here, the commission acted within its statutory authority when it found it was not bound by the maximum medical improvement date offered by Drs. Blair and Schmidt in rendering a decision about Greer's eligibility for TTD benefits related to the tarsal tunnel surgery. The commission recognized "the concept of maximum medical improvement is helpful to the extent it permits the fact-finder to identify the point at which the question of permanent disability becomes ripe for determination." However, the commission made a factual determination that Greer was engaged in the rehabilitative process when he pursued treatment for his tarsal tunnel syndrome after the date he was believed to be at maximum medical improvement.

22

*Rehabilitative Process*

Alternatively, Employer argues that if the date of maximum medical improvement is not the appropriate time to terminate TTD benefits, the record does not contain substantial and competent evidence to support an award of TTD benefits beyond April 2007 because Greer was not engaged in the rehabilitative process when he had tarsal tunnel surgery. Employer contends that because the commission did not overturn the ALJ's determination that Greer achieved maximum medical improvement in April 2007, the award of TTD benefits beyond that date is contradictory. This Court disagrees.

As stated previously, the commission was not required to apply the maximum medical improvement date to terminate TTD benefits. A careful reading of the commission's decision shows the commission found that, given Greer's circumstances, "applying a per se rule that [TTD] benefits cannot be awarded after the date of maximum medical improvement works an absurd result." While the commission did not overturn the ALJ's finding explicitly, it clearly rejected its application to the facts here, which it was entitled to do under the plain language of section 287.149.1 because it found Greer was engaged in the rehabilitative process when he had tarsal tunnel surgery.

Employer was aware Greer suffered from tarsal tunnel syndrome related to his work-related injury as early as February 2007, when Dr. Blair noted tenderness over the tarsal tunnel and diagnosed Greer with possible tarsal tunnel syndrome. Even after Dr. Blair released Greer to return to work and found he was at maximum medical improvement in April 2007, Greer continued to experience symptoms that impacted his ability to work. Dr. Grebing treated Greer's tarsal tunnel syndrome in July 2007.

23

Dr. Graham found Greer had symptoms of possible tarsal tunnel syndrome in November 2007. Between November 2007 and December 2009, at least five physicians diagnosed and treated Greer for tarsal tunnel syndrome. In December 2009, Dr. Johnson diagnosed and treated Greer for tarsal tunnel syndrome and, ultimately, performed the surgery with Dr. Mackinnon in June 2010. After the surgery, Greer engaged in physical therapy and Dr. Johnson continued to treat him while he recovered until Greer's last visit on February 4, 2011. All of these actions were intended to restore Greer to a condition of health or normal activity by a process of medical rehabilitation.

Despite the evidence in the record that Greer was engaged in the rehabilitative process, Employer urges this Court to rely on Dr. Schmidt's testimony, opining the tarsal tunnel surgery was not reasonably necessary[4] and would have a predictably poor outcome to support its argument that Greer is not entitled to TTD benefits. It is undisputed Greer's condition, despite initially improving, worsened overall after the tarsal tunnel surgery.

The question of whether additional medical treatment for a work-related injury, especially treatment not guaranteed to improve or cure the condition, is part of the rehabilitative process cannot be answered until after the treatment occurs. Whether the treatment is part of the rehabilitative process is a fact question for the commission. However, whether the treatment is a success or failure is immaterial because section

---

[4] This Court notes the commission affirmed Greer's award of medical expenses related to the tarsal tunnel surgery as being reasonable, necessary, and related to his work-related injury, which undercuts Employer's argument that the surgery was unnecessary, especially in light of Employer's failure to challenge the medical expenses on appeal.

287.149.1 does not precondition an award of TTD benefits on whether a claimant demonstrates he or she had a successful outcome from the treatment. The statute only requires that a claimant be engaged in the rehabilitative process. Accordingly, the fact that the tarsal tunnel surgery was ultimately unsuccessful and worsened Greer's condition does not render him *per se* ineligible for TTD benefits under any construction of the statute.

Employer further faults the commission for relying on Dr. Schmidt's opinion that "one would be expected to lose a significant amount of time from work following the surgery performed by Drs. Johnson and Mackinnon." Employer maintains Dr. Schmidt's opinion was generic and did not apply to Greer specifically. However, the commission found credit in Dr. Schmidt's opinion and concluded Greer, who had the same surgery Dr. Schmidt testified would require time off of work, would be unable to work while recovering from the surgery, thus, supporting the TTD benefits award from the date of the surgery until he was released in February 2011. The record also shows Dr. Johnson found Greer would need additional pain management above and beyond the normal patient during the postoperative period, which when combined with Dr. Schmidt's testimony, supports an award of TTD benefits in this case.

Finally, Employer maintains that this holding will result in employers being perpetually liable to injured workers for TTD benefits anytime an injured worker chooses to seek out and undergo any conceivable treatment, even years after an employer has provided an employee with all treatment necessary to achieve maximum medical

25

improvement.[5]  Section 287.170 contemplates an award of up to 400 weeks of TTD benefits, which is approximately a seven-and-a-half-year period of time.  Despite this extended time period, whether a claimant is engaged in the rehabilitative process is a fact-intensive inquiry the commission must resolve prior to awarding TTD benefits.  In this case, there was overwhelming substantial and competent evidence presented that Greer was not engaging in "any conceivable treatment" for "years beyond his injury" as discussed previously.  Rather, Greer was engaged in professionally accepted, medically relevant prescribed treatment.  Accordingly, the commission did not err in modifying the ALJ's decision and awarding Greer an additional period of TTD benefits after his tarsal tunnel surgery.

**Safety Violation Reduction**

---

[5] Implicit in Employer's argument is that Greer malingered in seeking treatment for his tarsal tunnel syndrome and in not having his workers' compensation claim decided in a timely manner because it took approximately six years for the claim to be resolved. Employer's assertion during oral argument that the delay was attributable to Greer because the parties could not reach a settlement and were required to hold a hearing on the matter is unavailing.  This Court will not apply an adverse inference attributable to Greer for seeking a hearing on this matter when he has a statutory right to do so.  *See* section 287.450 (providing if the employer and employee cannot agree on compensation payable under chapter 287, either party may file an application for a hearing on the matters at issue and request a ruling thereon).  Moreover, Employer's assertion at oral argument that the ALJ made its determination and award prior to Greer's tarsal tunnel surgery is contradicted by the record.  Greer's tarsal tunnel surgery occurred on June 22, 2010, the hearing was held on May 7, 2013, and the ALJ's award was issued on July 5, 2013.

Employer argues the commission erred in failing to reduce Greer's total award by twenty-five to fifty percent because Greer's violation of safety rule #3 resulted in his work-related injury because it produced overwhelming competent evidence to the contrary. Employer points to Flakes' testimony and the counseling report Greer signed shortly after the accident wherein Greer attested the accident could have been prevented had he followed safety rule #3.

Section 287.120.5 permits the commission to reduce a claimant's compensation award by at least twenty-five percent, but not more than fifty percent, if the claimant's work-related injury was caused by his or her failure to obey any reasonable work safety rule adopted by the employer. To be entitled to an award reduction, the employer has the burden of proving that: (1) the employer adopted a reasonable rule for the safety of its employees; (2) the injury was caused by the employee's failure to obey the safety rule; (3) the employee had actual knowledge of the rule; and (4) prior to the injury, the employer made a reasonable effort to cause his or her employees to obey the safety rule. *Carver v. Delta Innovative Servs.,* 379 S.W.3d 865, 869 (Mo. App. W.D. 2012).

The commission found Employer's claim failed because it did not prove Greer had actual knowledge of Employer's safety rule. The commission noted the rule required employees *traveling* in equipment to keep all body parts within the running lines of the equipment. It was undisputed that at the time of the accident, Greer's forklift was stationary. Greer testified he was aware of the rule requiring him to keep all body parts inside the running lines of the forklift, but he believed this rule only applied when the forklift was in motion. The commission also found the fact that Greer signed the

27

counseling form did "nothing to relieve the inherent and inescapable contradiction in [E]mployer asking us to fault an employee whose forklift was stationary for violating a rule, which, by its own language, applies to employees who are 'traveling' in equipment." The commission found Greer's explanation to be "eminently reasonable and ultimately credible." This Court must defer to the commission's credibility determinations and the weight to be given conflicting evidence. *Witte*, 414 S.W.3d at 460. The commission concluded that, at best, Employer proved Greer engaged in a "momentary, inadvertent, technical violation of an unclear rule, the application of which he was not actually aware of" at the time of the accident. This Court agrees. The commission did not err in modifying the ALJ's award to overturn the imposition of the safety rule violation penalty.

**Future Medical Care Benefits**

Finally, Employer argues the commission erred in finding Greer needed future medical care and in awarding him future medical care benefits because the commission failed to apply the proper standard set forth in section 287.140.1 to establish that future medical treatment is reasonably required to cure and relieve a claimant from the effects of the work-related injury. Employer further argues the commission's factual findings do not establish a reasonable probability that Greer was in need of future medical care and its award was not supported by substantial and competent evidence in the record.

Section 287.140.1 requires an employer to provide to an employee "such medical, surgical, chiropractic, and hospital treatment, including nursing, custodial, ambulance and medicines, as may reasonably be required after the injury or disability, to cure and relieve

28

from the effects of the injury." Greer need not present "conclusive evidence" that future medical treatment is needed to be entitled to an award of future medical benefits. *Null v. New Haven Care Ctr., Inc.*, 425 S.W.3d 172, 180 (Mo. App. E.D. 2014). Instead, Greer needs only to show a reasonable probability that the future treatment is necessary because of his work-related injury. *Id.* Future medical care should not be denied simply because an employee may have achieved maximum medical improvement. *Pennewell v. Hannibal Reg'l Hosp.*, 390 S.W.3d 919, 926 (Mo. App. E.D. 2013).

The commission found that Dr. Berkin prescribed treatment recommendations that included the use of nonsteroidal anti-inflammatory medication and analgesics for Greer's left foot and that ankle pain justified ordering Employer to provide future medical care. Employer argues Dr. Berkin's recommendation is tenuous at best and is far outweighed by the greater weight of the medical authority demonstrating that no future medical treatment is required. Employer points out Dr. Johnson did not recommend any further treatment and opined that he was uncertain that a tendon transfer would provide Greer "with any significant benefit." Employer cites Dr. Graham's opinion detailing how he believed Greer would not gain any benefit from pain management measures due to how Greer performed on the psychological examination. Finally, Employer cites the opinions of Drs. Blair and Schmidt that Greer achieved maximum medical improvement in April 2007 and needed no further treatment.

In making these arguments, Employer aks this Court to reexamine the weight the commission gave to the witnesses' testimony to rule in its favor on this issue. This Court's standard of review prevents us from doing so. Whether to accept conflicting

29

medical opinions is a fact issue for the commission, to which this Court defers. *Hornbeck*, 370 S.W.3d at 632. The commission recognized the medical opinions that stated Greer achieved maximum medical improvement. However, the statute contemplates medical treatment that gives comfort or relief even though a cure is beyond avail. *Landman v. Ice Cream Specialties, Inc.*, 107 S.W.3d 240, 249 (Mo. banc 2003) (overruled on other grounds by *Hampton*, 121 S.W.3d at 224). The commission chose to adopt Dr. Berkin's prescribed treatment recommendations, which resulted in medical treatment after the date Greer achieved maximum medical improvement. Further, the commission relied on Dr. Johnson's testimony that discussed Greer's need for pain management to help alleviate his neurogenic pain and a possible tendon transfer in the future. The commission concluded that based on this medical evidence, Greer was entitled to future medical care. The commission's decision to award Greer future medical care benefits is supported by substantial and competent evidence in the context of the whole record.

## Conclusion

The commission's award is affirmed.

 

_____
GEORGE W. DRAPER III, JUDGE

All concur.

30