

# In the Missouri Court of Appeals
## Eastern District

DIVISION FOUR

| | | |
|---|---|---|
| THOMAS WILLIAMS, | ) | No. ED108319 |
| | ) | |
| Appellant, | ) | Appeal from the Labor and |
| | ) | Industrial Relations Commission |
| v. | ) | |
| | ) | Injury No: 02-048799 |
| TREASURER OF THE STATE OF | ) | |
| MISSOURI, AS CUSTODIAN OF THE | ) | |
| SECOND INJURY FUND, | ) | |
| | ) | |
| Respondent. | ) | Filed: June 30, 2020 |

Introduction

Thomas Williams (Williams) appeals the award of permanent total disability benefits by the Labor and Industrial Relations Commission (Commission), which found that he was entitled to benefits beginning on May 9, 2016. Because we find the Commission ignored uncontradicted and unimpeached evidence that Williams actually reached maximum medical improvement on September 8, 2003, we conclude the starting date of the award is not supported by sufficient evidence and is against the overwhelming weight of the evidence. We modify the Commission's award to begin benefits on September 8, 2003 and affirm the award as modified.

## Background

Williams began working for the Hussmann Corporation (Employer) as an assembler in 1992. His job required pumping a pedal with his foot to raise equipment on an assembly line, and then stepping up to and down from a 1.5-foot-tall platform, 65 to 85 times per day. Because of a pre-existing condition in his right foot, Williams pumped the pedal and stepped up and down solely with his left foot. Over time, he developed pain in his left knee.

In 2002, Williams sought treatment for his left knee. He received three knee surgeries, including first a repair of a torn medial meniscus in May of 2002, then a partial knee replacement in August of 2002, and finally a revision of the previous knee replacement in August of 2003. Williams also was seeing a physician for treatment of back pain. On September 8, 2003, the knee surgeon, Dr. Maylack, released Williams from his care. Williams continued to experience pain, but he attempted to return to work with Employer. At that time, Employer notified Williams there was no job available with the restrictions he required. Williams continued to seek treatment for ongoing left knee and low back pain for the next several years.

In 2010, Williams moved to Tennessee. He sought treatment there for pain in his left knee and right ankle, and he received injections and pain medication from doctors there. In 2014, Williams moved to Rolla, Missouri. He continued to seek treatment for pain in his left knee and lower back, receiving injections and pain medication. He underwent surgery for a total knee replacement on April 8, 2016, and the surgeon released him from care on May 9, 2016. Since then, Williams has continued receiving medication to treat pain in his knee and lower back from his primary care physician.

In the summer of 2006, he attempted to return to work, but the physical demands, which included loading drinks onto a golf cart for sale to customers using the golf course, increased pain in his left knee, back, and right foot. He has not worked since that time. Williams sought disability benefits from the Second Injury Fund (SIF). The ALJ heard the following evidence.

Dr. Raymond Cohen offered testimony on behalf of Williams. Dr. Cohen evaluated Williams on two occasions. On June 28, 2004, Dr. Cohen diagnosed Williams with a cumulative trauma/overuse disorder involving the left knee, as well as a lumbar myofascial pain disorder due to a compensatory gait. He found that Williams was permanently disabled as a result of these conditions: 80% permanent partial disability at the left knee and 10% of the body as a whole at the lumbar spine. He further found Williams had a pre-existing 60% permanent partial disability at the right ankle, and that his pre-existing condition combined with the work-related injury created a greater overall disability than their simple sum. Dr. Cohen stated that Williams would need additional medical care, and restricted Williams' activities as follows: no prolonged standing, stooping, crawling, kneeling, or any other repetitive work involving lower extremities. Dr. Cohen further observed that at some point, Williams would need another knee replacement. He testified at a deposition in 2009 that a typical total knee replacement lasts between seven and fifteen years, and any subsequent knee replacement lasts approximately half the time the prior one lasted. According to Dr. Cohen, partial knee replacements may last longer, but it depends on the type of partial knee replacement.

On September 3, 2015, Dr. Cohen evaluated Williams again, finding Williams had a severely antalgic gait, that he walked with a cane, and that there was a severe loss in

3

range of motion in the lumbar spine with marked tenderness to palpitation. Dr. Cohen assigned the same disability ratings and recommended the same restrictions on physical activity regarding Williams' low back and left knee. At the time of Dr. Cohen's second evaluation, he noted that Williams intended to undergo surgery for a total left knee replacement. Dr. Cohen did not examine Williams after this final surgery, but he noted again that Williams will likely need additional knee replacements in the future because each replacement lasts for approximately half the time of the prior one.

Dr. Michael Nogalski offered testimony on behalf of Employer at a deposition in 2011, which the SIF submitted as evidence at the hearing before the ALJ. Dr. Nogalski evaluated Williams on February 5, 2004. Though he did not find that Williams' work injuries caused his disability, Dr. Nogalski did opine that Williams had reached maximum medical improvement (MMI) as of the date of his evaluation on February 5, 2004. Dr. Nogalski stated that Williams still had ongoing symptoms that are most likely related to degenerative disease within the knee itself.

Timothy Lalk, a vocational rehabilitation counselor, offered testimony on behalf of Williams. Lalk evaluated Williams on October 18, 2007. He concluded that with the restrictions Dr. Cohen gave, Williams would only be able to work in a limited capacity at sedentary or near sedentary occupations. However, based upon Lalk's observations of Williams' physical difficulty during his interview, Lalk believed Williams would not be able to maintain employment in the open labor market. Lalk observed that Williams was unable to change positions without difficulty and appeared unsteady when walking, which Lalk felt would concern a potential employer during a typical job interview. Lalk again evaluated Williams on June 23, 2016, after Williams' release from care following his most

recent surgery. Lalk again observed that Williams had difficulty and discomfort when sitting, changing positions, walking, and standing. He did not believe Williams would be able to secure employment in the open labor market.

After reviewing all of the evidence and testimony submitted, the ALJ concluded that Williams was unable to secure and maintain employment in the open labor market, that Williams' work activities caused his medical condition and disability, and that his pre-existing disability combined with the work-related disability rendered him permanently and totally disabled. The ALJ found Williams reached MMI on May 9, 2016, the date he was released from care after his most recent knee surgery. Thus, the ALJ concluded that the SIF is liable for permanent total disability (PTD) benefits starting on May 9, 2016.

Williams appealed the ALJ's decision to the Commission, which affirmed the ALJ's award, while clarifying in a supplemental opinion that the applicable version of Chapter 287 is from RSMo. 2000, based on the date of Williams' injury in 2002. The Commission also incorporated the ALJ's award by reference. One commissioner dissented, noting that he would find that Williams reached MMI on September 8, 2003, when Dr. Maylack released Williams from care following his third knee surgery. This appeal follows.

Discussion

Williams' sole point on appeal is that the Commission erred in finding that Williams reached MMI on May 9, 2016, rather than September 8, 2003, and thus erred in failing to award PTD benefits beginning on September 8, 2003. We agree.

In reviewing a decision by the Commission, we review only questions of law and may modify, reverse, remand for rehearing, or set aside the award only if: (1) the

5

Commission acted without or in excess of its powers; (2) the award was procured by fraud; (3) the facts found by the Commission do not support the award; or (4) there was not sufficient competent evidence in the record to warrant making the award. Section 287.495, RSMo 2000.[1] We examine the whole record to determine whether there is sufficient competent and substantial evidence to support the award, or whether the award is contrary to the overwhelming weight of the evidence. Hampton v. Big Boy Steel Erection, 121 S.W.3d 220, 222-23 (Mo. banc 2003). "We defer to the Commission's assessment of witness credibility and the weight given to the testimony." Pursley v. Christian Hosp. Ne./Nw., 355 S.W.3d 508, 514 (Mo. App. E.D. 2011).

At the time of Williams' injury, Section 287.800 required the Workers' Compensation Law "to be broadly and liberally interpreted with a view to the public interest, and [the law wa]s intended to extend its benefits to the largest possible class." Wolfgeher v. Wagner Cartage Serv., Inc., 646 S.W.2d 781, 783 (Mo. banc 1983) (citing Section 287.800, RSMo. 1978 (identical to Section 287.800, RSMo. 2000)). "Any doubt as to the right of an employee to compensation should be resolved in favor of the injured employee." Id.

The Workers' Compensation Law provides benefits to injured employees based on a progression of their injuries, from temporary to permanent. Temporary disability begins at the time of the injury and covers a claimant's expenses from that date, typically until he or she is able to return to work. See Birdsong v. Waste Mgmt., 147 S.W.3d 132, 140 (Mo. App. S.D. 2004) (claimant entitled to temporary disability benefits until claimant can find employment or condition has reached point of maximum medical progress). "Temporary

---

[1] Williams' injury occurred in 2002, thus the applicable version of the Workers' Compensation Law is Chapter 287, RSMo. 2000. All statutory references herein are to this chapter, unless otherwise indicated.

disability awards are intended to cover a healing period." Williams v. Pillsbury Co., 694 S.W.2d 488, 489 (Mo. App. E.D. 1985), cited in Greer v. SYSCO Food Servs., 475 S.W.3d 655, 667 (Mo. banc 2015). Such awards do not "encompass disability after the condition has reached the point where further progress is not expected." Id. If a claimant reaches this point and does not fully recover from his or her injuries, then permanent disability benefits become available.

Here, neither party disputes the Commission's finding that Williams is permanently and totally disabled. The Workers' Compensation Law defines "total disability" as "inability to return to any employment and not merely . . . inability to return to the employment in which the employee was engaged at the time of the accident." Section 287.020.7.[2] The sole issue is when Williams became eligible for PTD benefits, essentially, when Williams' inability to work became permanent, rather than temporary. Determining that date required the Commission to ascertain the point in time at which Williams' condition shifted from a healing period to a stage where further progress was no longer expected.

Though the term "maximum medical improvement" (MMI) was not part of the Workers' Compensation Law prior to 2017, our courts have long used the term, or similar language, in determining the point at which a claimant's condition was not expected to improve, therefore becoming a permanent condition.[3] See Cardwell v. Treasurer of State of Mo., 249 S.W.3d 902, 909-10 (Mo. App. E.D. 2008) (discussing various terms used by

---

[2] Section 287.020 has since been amended, but the definition of "total disability" remains the same. Section 287.020.6, RSMo. Supp. 2017.

[3] Currently, Section 287.200.1, RSMo. Supp. 2017 states, "Compensation for permanent total disability shall be paid during the continuance of such disability *from the date of maximum medical improvement* . . . ." (emphasis added). The version of this section in RSMo. 2000 omits the italicized language.

7

courts over time, noting use of "maximum medical improvement" in <u>Vinson v. Curators of Univ. of Mo.</u>, 822 S.W.2d 504, 508 (Mo. App. E.D. 1991)). "Although the term [MMI] is not included in the statute, the issue of whether any further medical progress can be reached is essential in determining when a disability becomes permanent . . . ." <u>Id.</u> at 910.

Here, the evidence in the record does not support the Commission's finding that Williams reached MMI after his release from his most recent knee replacement surgery on May, 9, 2016. The Commission considered expert testimony in the form of depositions from Dr. Cohen on behalf of Williams and Dr. Nogalski on behalf of the SIF, and both found Williams reached MMI well before his 2016 surgery. Dr. Nogalski, who saw Williams in 2004, believed Williams had reached MMI at that point, though he did not find Williams' injuries to be caused by Williams' employment.

Dr. Cohen, whose testimony the Commission found "to be more credible and thus persuasive to the issues at hand," concluded in 2004 that Williams was permanently disabled, including 80% permanent partial disability at the left knee, 10% permanent partial disability of the whole body at the lumbar spine, and 60% pre-existing permanent partial disability at the right ankle. Moreover, Dr. Cohen rated Williams' levels of disability the same in his second evaluation of Williams, on May 24, 2016. Dr. Cohen deferred to a vocational expert regarding whether Williams would be able to obtain employment on the open labor market, but he did place work restrictions on Williams, which were the same in both 2004 and 2016. Dr. Cohen further predicted Williams would need additional knee replacement procedures due to the nature of such a surgery. He explained in both 2009 and 2016 that knee replacements do not last longer than approximately 15 years, decreasing

with each subsequent knee replacement, and thus Williams would need multiple knee replacement surgeries in the future.

No expert testified that Williams reached MMI upon his release from the revision of his knee replacement surgery on May 9, 2016, and there was no testimony that the 2016 surgery improved Williams' condition. Williams testified at the hearing on June 12, 2018 that he continues to have symptoms. Lalk, who evaluated Williams following his 2016 surgery, testified that he again observed Williams' physical difficulties during his evaluation, and that his opinion regarding Williams' ability to maintain employment was the same as it was during Lalk's first evaluation, in 2007. Williams' treatment since his third surgery in 2003 has consisted of pain management and an additional knee replacement surgery, as Dr. Cohen stated he would need, simply because of the nature of knee replacements and their limited longevity. The SIF did not introduce expert testimony or other evidence to contradict these experts' opinions regarding Williams' MMI, or Dr. Cohen's testimony regarding the longevity of knee replacements and the resulting necessity for Williams' 2016 left knee replacement.

"Acceptance or rejection of evidence is generally an issue for the Commission to determine." Hazeltine v. Second Injury Fund, 591 S.W.3d 45, 59 (Mo. App. E.D. 2019). However, "when a workers' compensation record shows no conflict in the evidence or impeachment of witnesses, 'the reviewing court may find the award was not based upon disbelief of the testimony of the witnesses.'" Houston v. Roadway Express, Inc., 133 S.W.3d 173, 179 (Mo. App. S.D. 2004) (quoting Corp v. Joplin Cement Co., 337 S.W.2d 252, 258 (Mo. banc 1960)). The Missouri Supreme Court reasoned as follows:

> [T]he Commission may not arbitrarily disregard and ignore competent, substantial and undisputed evidence of witnesses

9

*who are not shown by the record to have been impeached*, and the Commission may not base their finding upon conjecture or their own mere personal opinion unsupported by sufficient competent evidence.

Corp, 337 S.W.2d at 258 (quoting Sanderson v. Producers Comm'n Ass'n, 229 S.W.2d 563, 567 (Mo. 1950)). While the Commission is free to disbelieve uncontradicted and unimpeached testimony, absent express findings to this effect, the Commission may not ignore such evidence. See Hazeltine, 591 S.W.3d at 59; Houston, 133 S.W.3d at 179-80.

Here, the Commission made no findings that it disbelieved Williams or any of his experts on the issue of MMI. In fact, the only credibility findings were that Dr. Cohen's testimony was "more credible and thus persuasive to the issues at hand," and that Williams' testimony was "consistent, credible and forthright." Because the Commission did not expressly disbelieve this testimony, nor was it contradicted or impeached, we find the Commission erred in disregarding it. See Hazeltine, 591 S.W.3d at 59. Both physicians testified that Williams' condition was of a permanent nature following his third surgery in 2003, and that he remained symptomatic and in need of pain medication. Williams remained in that condition until his testimony in 2018. There was no evidence his condition improved following his 2016 surgery; rather, the evidence was that he needed a knee replacement because all knee replacements over time must be replaced again.

The Commission's reasoning regarding MMI does not contradict this testimony, nor does its conclusion necessarily follow from its factual findings:

> [A]lthough Claimant was released from care in 2003, Claimant remained symptomatic and Claimant underwent additional medical treatment and surgical intervention that his expert directly related to the primary injury. Specifically, Claimant required another revision of his left total knee replacement which was performed in 2016.

10

These findings are consistent with the uncontradicted and unimpeached evidence that Williams reached MMI upon his release from care in 2003. His continuing symptoms did not improve with the knee replacement surgery in 2016, and the medical treatment he has received since his 2003 left knee replacement has consisted of pain management and a revision of a knee replacement that had deteriorated. "The Commission may not arbitrarily disregard or ignore competent, substantial, and undisputed evidence of witnesses not impeached or base its finding on conjecture or its own opinion unsupported by sufficient evidence." Hazeltine, 591 S.W.3d at 60 (citing Bond v. Site Line Surveying, 322 S.W.3d 165, 171 (Mo. App. W.D. 2010)). Thus, the Commission erred in finding that Williams did not reach MMI until May 9, 2016. Point granted.

Conclusion

The Commission's finding that Williams reached MMI on May 9, 2016 is unsupported by sufficient competent evidence and is against the overwhelming weight of the evidence. The undisputed and unimpeached evidence shows that Williams reached MMI when he was released from care on September 8, 2003. We modify the Commission's award of PTD benefits to begin on September 8, 2003. In all other respects, the award is affirmed.

_____
Gary M. Gaertner, Jr., Judge

James M. Dowd, P.J., and
Robin Ransom, J., concur.