

# In the Missouri Court of Appeals
# Eastern District
## DIVISION THREE

| | | |
|---|---|---|
| JAMES ECKARDT, | ) | No. ED112132 |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Labor and Industrial Relations Commission |
| TREASURER OF MISSOURI AS | ) | |
| CUSTODIAN OF THE SECOND INJURY | ) | |
| FUND, | ) | |
| | ) | |
| Respondent/Cross-Appellant. | ) | Filed: July 30, 2024 |

Before Lisa P. Page, P.J., Gary M. Gaertner, Jr., J., and Angela T. Quigless, J.

James Eckardt (Claimant) appeals from the Missouri Labor and Industrial Relations Commission (Commission) award denying his claim for Second Injury Fund (Fund) benefits due to his undisputed permanent total disability (PTD) from multiple work injuries. The Fund cross-appeals the inclusion of Claimant's occupational disease in the award. We reverse and remand the denial of Fund benefits but affirm the determination regarding occupational disease.

## Background

In 1976, Claimant began working as an aircraft mechanic. In the course of more than forty years of employment in the airline industry, he sustained seven work injuries. The St. Louis Division of Worker's Compensation administrative law judge (ALJ) conducted a hearing on his workers' compensation claim in November 2022 and issued an award in favor of Claimant

for permanent total disability (PTD) benefits against the Fund. The Fund appealed and the Commission issued its award denying Fund benefits.

During the November 2022 hearing, Claimant presented evidence of his education, work history, and the extent of his work injuries during those years. He submitted, without objection, expert medical evidence from Dr. David Volarich, who performed three separate independent medical examinations (IMEs) and completed three medical reports, with supporting medical records.[1] All three IMEs confirmed Claimant's testimony regarding his subsequent permanent partial disability (PPD) from these work injuries.

In sum, Claimant testified that he graduated from high school and after one year of college, he honorably served in the U.S. Air Force for four years, training as an aircraft mechanic. Following discharge, Claimant received federal certification to be an aircraft mechanic and worked in the commercial transportation and airline industry over forty years until his retirement in 2017. His work duties included changing and repairing parts for several mechanical and electrical components of modern aircraft. This entailed frequent walking, standing, climbing, and crawling both indoors and outdoors. He used assorted tools in tight and awkward spaces and lifted up to 100 pounds.

Claimant was first injured in March 1998, when he stepped in a hole near an airplane gate and injured his right knee, resulting in two knee surgeries and, eventually in 2014, a right knee total arthroplasty. While he went back to work, from the date of this injury and even leading up to the primary injury,[2] he found it hard to kneel and walk on the right knee. On September 6, 2001, he sustained a second injury when he fell from a ladder at work, which resulted in two left

---

[1] No deposition testimony was submitted, nor did Dr. Volarich testify at the hearing.
[2] The final "subsequent compensable work-related injury" referred to in Section 287.220.3(2)(b) is often called the "primary injury." *See State v. Parker*, 622 S.W.3d 178, 182 (Mo. banc 2021).

2

knee surgeries. Again, he returned to work, but from the date of this injury until his primary injury, his left knee problems were exacerbated because he had to go up and down jetway stairs to airplanes, walk from gate to gate, and work kneeling on the ground to change brakes and tires.

The third injury was on January 13, 2010, when Claimant slipped on ice while exiting the airport terminal and fell on his left arm. Claimant experienced immediate pain in his left shoulder and left wrist and was diagnosed with a fracture, a ligament tear, a triangular fibrocartilage complex (TFCC), a labral tear, and tendonitis/tendinosis. Claimant had surgeries on the left wrist and left shoulder in February 2010, with post-surgery complications and persistent pain in the left shoulder. He had a second left shoulder arthroscopy in January 2011, but he continued to have pain, weakness and numbness leading up to the primary injury in both his left shoulder and his left wrist. Although he went back to work, Claimant's left shoulder condition made it more difficult to use tools, lift, move, and pick up things at work.

Dr. Volarich's first IME was on October 13, 2011. He reviewed the injuries to the left shoulder, left wrist, right knee, and left knee, and opined, "The combination of his disabilities creates a substantially greater disability than the simple sum or total of each separate injury/illness, and a loading factor should be added."

Less than two years after his last left shoulder surgery, in November 2012, Claimant misjudged a step while exiting an airplane and caught the door handle to maintain his balance, injuring his right shoulder, resulting in his fourth work injury. He received immediate treatment for right shoulder pain. By January 2013, he was diagnosed with a right shoulder strain and impingement and was referred to physical therapy. Claimant testified he lost some range of motion in his right shoulder as a result of this impingement injury, which made it more difficult for him to lift and pick things up. However, he still returned to work.

3

The fifth and sixth injuries occurred prior to January 4, 2013, as Claimant had gradually developed pain, numbness, tingling, and diminished strength in both hands. He was diagnosed with work-related chronic, severe bilateral carpal tunnel syndrome, and had surgeries on his right wrist on February 8, 2013, and left wrist on March 1, 2013. However, Claimant continued to have numbness through his right hand and fingers post-surgery. He received a right wrist injection and an additional revision of the open right carpal tunnel release. Claimant testified he had "no feeling" in his hands leading up to the primary injury and that he frequently dropped items as a result. Despite his multiple injuries, and the challenges Claimant testified they presented in fulfilling his job duties, he continued to work.

On November 6, 2014, prior to Claimant's primary injury, Dr. Volarich provided another expert evaluation of Claimant, this time adding the injuries to Claimant's right shoulder, right and left-hand carpal tunnel, and progression of arthritic symptoms in his knees. Dr. Volarich again found the combination of his disabilities created a substantially greater disability than the sum of each separate injury, and a loading factor should be added.

Claimant sustained his seventh and primary injury on October 3, 2015, when he was struck by an open door of a moving van at work, causing him pain, stiffness and soreness in his right arm and shoulder, and a cervical sprain with underlying preexisting arthritic changes. An MRI confirmed cervical disc herniation at C3-4 and central cord base protrusions from C4-5. He had surgery in July 2016, which ultimately resulted in an incomplete incorporation at the C4 endplate and residual endplate spurring and bulging at C3-4 and a central protrusion at C4-5. The parties stipulated that Claimant reached maximum medical improvement (MMI) from his primary injury on January 26, 2017.

Claimant described his physically demanding employment, the work-related injuries, and the long-lasting effects of his multiple injuries. Although he had ongoing difficulties with both knees, both shoulders, and both wrists/hands, he continued to return to work leading up to his primary injury, after which he was physically no longer able to work in any employment. He explained that with each successive injury, he found it more difficult to do his job effectively. Claimant testified he finally "just couldn't do it anymore," after the October 3, 2015 injury combined with the multiple injuries he sustained over the years, although he "had every intention of going back to work if [he] could." He said he had "a pretty much difficult time doing anything" now.

Dr. Volarich's August 16, 2018 IME again detailed the synergistic effects of the injuries, in that "even before his neck injury, attaining awkward positions to install and remove heat exchangers was very difficult." He concluded that once the neck injury was added,

> the combined symptoms related to his bilateral knees, the mechanical dysfunction of his bilateral shoulders, and the neuropathic dysfunction of his carpal tunnel symptoms combined with the mechanical and neuropathic problems emanating from his neck injury causing him to reach a tipping point where it was basically impossible for him to perform his job duties.

Dr. Volarich stated a third time that the combination of Claimant's disabilities created a substantially greater disability than the sum of each separate injury, and a loading factor should be added. Dr. Volarich opined Claimant was permanently and totally disabled as a direct result of the October 3, 2015 work-related injury in combination with his preexisting medical conditions from his prior work injuries.

The ALJ issued an award in favor of Claimant for PTD benefits against the Fund. The ALJ concluded Claimant met his burden to show he was PTD due to a combination of his primary and his qualifying preexisting injuries which resulted in the following disabilities:

5

(1) right knee: 50% disability (80 weeks)
(2) left knee: 50% disability (80 weeks)
(3) left shoulder: 40% disability (92.8 weeks)
(4) left wrist: 45% PPD (78.75 weeks)
(5) right wrist: 40% PPD (70 weeks)

The ALJ noted the only preexisting injury that did not reach the statutory threshold was Claimant's right shoulder, which was 47.5 weeks or two weeks short of the statutory minimum absent any loading factor as recommended by Dr. Volarich. The Fund appealed both the award of benefits and the inclusion of Claimant's occupational disease injuries as a qualifying preexisting injury. The Commission reversed the ALJ's award and adopted, with modification, significant portions of the ALJ's findings of fact, and concluded the evidence failed to satisfy the standard set forth in Section 287.220.3 RSMo (2016).[3] Specifically, the Commission found "no credible or persuasive evidence in the record that [Claimant] is PTD due to the primary injury in combination with *only* preexisting disabilities that qualify under [Section] 287.220.3." (emphasis in original). The Commission did find Claimant's work-related carpal tunnel syndrome qualified as a preexisting disability under Section 287.220.3(2)(a)a(ii) because Section 287.067 specifically recognizes occupational diseases as compensable injuries. Therefore, Section 287.220.3(2)(a)a(ii)'s general reference to a compensable injury does not exclude a specific category of injury, and includes occupational diseases. This appeal follows.

## Discussion

Claimant raises two points on appeal, both alleging the Commission erred in finding Claimant's evidence failed to satisfy the standard set forth in Section 287.220.3 and ruling Claimant failed to meet his burden of proof. In his first point, Claimant argues the Commission erred because the uncontested evidence established that Claimant was permanently and totally

---

[3] All further statutory references are to RSMo (2016).

disabled as a direct result of his compensable primary injury in combination with qualifying preexisting medical disabilities. Claimant contends the Commission ignored the overwhelming weight of the evidence and misconstrued Claimant's expert medical opinions, which were not dependent on non-qualifying disabilities.

In his second point, Claimant alleges the Commission erred because the uncontested evidence established that Claimant was permanently and totally disabled as a direct result of his compensable primary injury in combination with qualifying preexisting disabilities, and the Commission's conclusion is not supported by sufficient competent evidence and is against the overwhelming weight of the evidence. Claimant contends the Commission misinterpreted the statute, focused on percentage of disability, not weeks as directed by the statute, and utterly ignored the uncontroverted expert medical evidence and Claimant's testimony regarding the synergistic effects of Claimant's injuries, all of which require application of a multiplicity factor.

In its cross-appeal, the Fund alleges the Commission misapplied Section 287.220.3(2)(a)a(ii), because it failed to strictly construe the statute because the plain text only applies to Section 287.020, regarding compensability standards for accidents, and does not include occupational diseases in Section 287.067.

### Standard of Review

On an appeal from a decision and final award of the Commission, this court may modify, reverse, remand, or set aside the Commission's award only if the Commission (1) acted outside the scope of its powers; (2) procured the award by fraud; (3) found facts that do not support the award; or (4) there was not sufficient, competent evidence in the record to warrant making the award. Section 287.495.1. This court must examine the whole record and determine whether it contains sufficient and substantial evidence to support the award, i.e., whether the award is

contrary to the overwhelming weight of the evidence. *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222-23 (Mo. banc 2003). We review the findings and conclusions made by the Commission, as well as those made by the ALJ that are adopted by the Commission. *Cook v. Missouri Hwy & Transp. Comm'n*, 500 S.W.3d 917, 922 (Mo. App. S.D. 2016). "This Court must defer to the commission's findings on issues of fact, the credibility of the witnesses, and the weight given to the conflicting evidence." *Greer v. SYSCO Food Servs.*, 475 S.W.3d 655, 664 (Mo. banc 2015) (citing *Treasurer of State- Custodian of Second Injury Fund v. Witte*, 414 S.W.3d 455, 460 (Mo. banc 2013)). However, we must strictly construe the provisions of the workers' compensation statutes, and afford no deference to the Commission's interpretation of the law. 287.800.1; *Cosby v. Treasurer*, 579 S.W.3d 202, 206 (Mo. banc 2019).

*Analysis*

In Claimant's first point, he contends the Commission erred in finding his evidence failed to satisfy the standard set forth in Section 287.220.3, because the uncontested evidence established that Claimant was PTD as a direct result of his compensable primary injury in combination with his qualifying preexisting medical disabilities. Claimant argues the Commission ignored the overwhelming weight of the evidence and misconstrued his expert medical opinions, which were not dependent on non-qualifying disabilities, in direct contravention of *Treasurer of State v. Parker*, 622 S.W.2d 178, 182 (Mo. banc 2021).

It is undisputed Claimant is permanently and totally disabled and the sole issue on appeal is whether his PTD is compensable by the Fund, which is governed by Section 287.220.2. To make such a compensable claim against the Fund, a claimant must meet two conditions. First, the employee must have at least one qualifying preexisting disability, which must be medically documented, equal to at least 50 weeks of PPD and meet one of the four listed criteria in Section

8

287.220.3(2)(a)a(i)-(iv). Second, the employee must show he sustained a subsequent compensable work-related injury that results in a permanent total disability when combined with the preexisting disability. Section 287.220.3(2)(a)b. Therefore, regardless of whether the claimant has one or multiple preexisting disabilities, the claimant must establish that the primary injury results in PTD when combined with the preexisting disabilities that qualify in order to satisfy the second condition of the statute. Section 287.220.3; *see Parker*, 622 S.W.3d at 181.

The Fund argues the Missouri Supreme Court decisions in *Parker* and *Klecka* preclude Fund compensation. *Id.*; *Klecka v. Treasurer of State*, 644 S.W.3d 562, 567 (Mo. banc 2022). The Missouri Supreme Court analyzed the same criteria in both cases to determine whether the claimant established a compensable claim. *Id.* The *Parker* Court held that the existence of potential non-qualifying disabilities counts neither for nor against a claimant when evaluating whether the claimant satisfies the second condition for Fund liability. 622 S.W.3d at 182.

*Klecka* clarified *Parker* by holding a claimant seeking Fund compensation was required to prove his alleged PTD was caused by a combination of the primary injury and qualifying conditions without consideration of non-qualifying disabilities. 644 S.W.3d at 567. There the claimant failed to satisfy the Section 287.220.3 standard for Fund liability because his "evidence was undermined by his experts improperly incorporating his non-qualifying preexisting disabilities into their opinions." *Id*. The claimant produced evidence of five preexisting disabilities, but just a **sole** injury met the PTD threshold minimum of 50 weeks PPD. *Id*. at 564, 565. The evidence was clear that the expert opinions were based on several non-qualifying injuries. *Id*. at 567. As a result, there was no evidence in the record to suggest the claimant was PTD as a result of his primary injury and his **sole** qualifying disability. *Id.* at 565.

9

We find this matter is the inverse of *Klecka*. Claimant here presented evidence of six preexisting injuries, in addition to the primary injury, and all of those preexisting injuries were found to qualify as at least 50 weeks of PPD, except for one – Claimant's right shoulder rated at 20% PPD (46.4 weeks). Dr. Volarich considered all of Claimant's injuries relating to Claimant's bilateral knees, bilateral shoulders, and carpal tunnel symptoms combined with the neck injury[4] to cause his PTD. However, we can reasonably infer that the injuries Claimant sustained as described in the final IME – right wrist at 50% PPD (61.2 weeks), left wrist at 35% PPD (61.25 weeks); left shoulder at 45% PPD (104.4 weeks), right knee at 65% PPD (104 weeks), and left knee: 65% PPD (104 weeks) – were more than sufficient to satisfy the statutory requirements for Fund liability. In fact, even absent inclusion of the right shoulder, the qualifying preexisting disabilities totaled more than 400 weeks – or eight times the 50-week minimum.

This inference was not possible in *Klecka* when his one preexisting injury qualified while several did not, but were still included in the expert's assessment of claimant. Rather, the multiple preexisting qualifying injuries and just a "sole" non-qualifying injury do not exclude Claimant from satisfying the second condition because, as *Parker* holds, he can still show that the primary injury in combination with any and all preexisting disabilities that actually qualify as PTD. *Id.* at 182.

We recognize and commend the Commission's endeavor to comply with both our Supreme Court precedent and the legislative mandate to strictly construe Section 287.220.3. However, this decision goes too far because it essentially adds language to Section 287.220.3(2)(a)b, which states, "Such employee thereafter sustains a subsequent compensable work-related injury that, when combined with the preexisting disability, as set forth in items (i),

---

[4] The primary injury of the cervical spine was rated at 35% PPD of the body as a whole, or 140 weeks.

(ii), (iii), or (iv), of subparagraph a. of this paragraph, results in a permanent total disability as defined under this chapter."

The *Klecka* Court held the claimant "failed to establish his primary injury and **sole** qualifying preexisting disability entitled him to PTD benefits from the Fund under Section 287.220.3." 644 S.W.3d at 568 (emphasis added). The Court did not use the term "only," but was simply referring to the fact that Klecka had just one qualifying preexisting disability by use of the word "sole." However, the Commission extends the *Klecka* holding here by finding Claimant failed to establish "the primary injury in combination with *only* preexisting disabilities that qualify under [Section] 287.220.3" entitled him to PTD benefits. (emphasis in original). The word "only" is not found in the relevant Section 287.220.3(2)(a)b regarding preexisting disabilities, nor is it used in either *Klecka* or *Parker*. Thus, the Commission added the word "only" into the statute, which is not permissible, especially when strictly complying with workers' compensation law. *See Cosby v. Treasurer of State*, 579 S.W.3d 202, 206 (Mo. banc 2019). Moreover, the finding contravenes the *Parker* rule that "[t]he existence of non-qualifying disabilities does not count against (or for) the claimant in evaluating whether he meets the second threshold condition." 622 S.W.3d at 182.

We find guidance to reach this conclusion in *Obermann v. Treasurer of the State of Missouri*, 681 S.W.3d 559 (Mo. App. E.D. 2023). There, the Commission denied Obermann's claim for Fund benefits based on its finding that his medical and vocational rehabilitation experts included a non-qualifying disability in their reports and testimony, even though there were four other qualifying disabilities plus the primary injury. *Id*. at 561. However, this court reversed the Commission's decision on appeal because the conclusion that Obermann was PTD did not rely on the non-qualifying disability. *Id*. at 565. The court explained the Section 287.220.3(2)

11

analysis was a "causation question" asking whether the primary and qualifying preexisting disabilities *caused* the PTD. *Id*.

> Parker made clear that "[t]he existence of non-qualifying disabilities does not count against (or for) the claimant in evaluating whether he meets the second threshold condition." Thus, nothing prohibits a claimant's medical and vocational experts from *considering* non-qualifying disabilities in connection with their comprehensive review of a claimant's injury and disability history.

*Id*. at 565 (internal citations omitted). The court added that while these injuries may be considered, the experts may not include and rely on non-qualifying disabilities to determine PTD causation. *Id.* As in *Obermann*, Claimant's "extensive injury history is remarkable" too, "not only for the sheer number of injuries but for the severity of those injuries[.]" *Id.* at 562. Additionally, the record is "wholly silent concerning the Commission's weighing of credibility and neither the claimant nor the experts testifying on his or her behalf are contradicted or impeached, the Commission may not arbitrarily disregard and ignore competent, substantial and undisputed evidence." *Id*. at 564 (quoting *Hazeltine v. Fund*, 591 S.W.3d 45, 59 (Mo. App. E.D. 2019)).[5]

In this matter, Dr. Volarich may have considered all of Claimant's disabilities, but his final determination that Claimant was permanently and totally disabled does not rely on Claimant's preexisting non-qualifying right shoulder injury. All of his other disabilities sufficiently combine to cause the PTD absent the right shoulder injury.

Accordingly, we find the Commission erred when it denied Claimant Fund benefits because its determination was not supported by sufficient competent evidence. Instead, the evidence supported the statutory requirements for Fund liability because Claimant demonstrated

---

[5] The Fund argues the findings of the Commission are determinations of credibility that require the court's deference, but nowhere in the award does the commission specifically find any of the opinions credible or persuasive. *See McCoy v. Meridian Med. Tech.*, 675 S.W.3d 740, 742 (Mo. App. E.D. 2023).

12

he had sustained a "subsequent compensable work-related injury, that, when combined with the preexisting disability, . . . results in a permanent total disability." Section 287.220.3(2)(a)b. Claimant's first point is granted and the Commission is instructed to grant Claimant PTD benefits to which he is entitled from the Fund. Claimant's first point is dispositive, thus we need not discuss his second point and continue our analysis with the Fund's cross-appeal.

*Cross-Appeal*

On cross-appeal, the Fund argues the Commission's award is not supported by substantial or competent evidence, because the Commission misapplied Section 287.220.3(2)(a)a(ii) (Section (ii)), which states,

> (2) . . . . Claims for permanent total disability under section 287.200 against the second injury fund shall be compensable only when the following conditions are met:
> (a) a. An employee has a medically documented preexisting disability equaling a minimum of fifty weeks of permanent partial disability compensation according to the medical standards that are used in determining such compensation which is:
> . . .
> (ii) A direct result of a compensable injury as defined in section 287.020;

by failing to strictly construe the statute by including Claimant's carpal tunnel syndrome as a preexisting compensable occupational disease. The Fund asserts the plain text of Section (ii) only refers to Section 287.020, outlining the compensability standards for accidents and does not include occupational diseases as found in Section 287.067; therefore, such injuries are excluded.

The Fund also argued to the Commission, as it does now on appeal, that Claimant's carpal tunnel syndrome fails to satisfy this statute because Section 287.020.3(5), provides that "injury" "shall in no case except as specifically provided in this chapter be construed to include

13

occupational disease in any form. . . ." This Commission reconsidered this argument a previous commission found persuasive in the *Lexow v. Boeing Co.*[6] decision.

The *Lexow* Commission concluded carpal tunnel syndrome does not satisfy Section (ii) because it is "the result of an occupational disease as defined in [Section] 287.067." This Commission disagreed and reasoned occupational diseases are compensable because a Section 287.067 occupational disease meets the definition of a compensable injury pursuant to workers' compensation law. The current Commission found this analysis "was more thoroughly considered and persuasive than the Commission's prior opinion." We agree.

Workers' compensation law is "entirely a creature of statute," and must be strictly construed. *Templemire v. W & M Welding, Inc.*, 433 S.W.3d 371, 381 (Mo. banc 2014); 287.800.1; *see also Cosby*, 579 S.W.3d at 206. In ascertaining the intent of the legislature, we consider the plain and ordinary meaning of the terms to give effect to that intent. *Templemire*, 433 S.W.3d at 381. When the statute's language is clear and unambiguous, the court must "give effect to the language as written" rather than "engag[ing] in statutory construction." *Bolen v. Orchard Farm R-V Sch. Dist.*, 291 S.W.3d 747, 751 (Mo. App. E.D. 2009). The long-established rule is that the legislature intended every word and clause of the statute to have effect. *Hyde Park Housing P'ship v. Dir. of Rev.*, 850 S.W.2d 82, 84 (Mo. banc 1993).

Even though the appellate decision in *Lexow* lacks precedential value, nothing precludes the Commission from adopting the same legal reasoning. *See*, *e.g.*, *McKenzie v. Day*, 57 F.3d 1493, 1494 (9th Cir. 1995) ("Although the opinion was subsequently vacated, [it] remains persuasive authority, and we adopt its analysis . . . as our own."). Here, the Commission opted to do so and quoted *Lexow* as follows:

---

[6] The Supreme Court dismissed the employee's appeal based on briefing deficiencies. *See Lexow v. Boeing Co.*, 643 S.W.3d 501, 509-10 (Mo. banc 2022).

> While we acknowledge the referenced language in § 287.020, we also consider § 287.067, which provides the definition for "occupational disease" and requirements to trigger the Fund's liability for an injury by occupational disease. Specifically, § 287.067.2 provides that "[a]n injury or death by occupational disease is *compensable* only if the occupational exposure was the prevailing factor in causing both the resulting medical condition and disability." (Emphasis added). It further provides that [a]n injury due to repetitive motion is recognized as an occupational disease for purposes of this chapter." § 287.067.3. Here, the plain language of § 287.220.3(2)(a)a(ii) requires only a "compensable injury." An occupational disease that meets § 287.067's definition and requirements is a *compensable* injury under the worker's compensation law. See generally *Peters v. Treasurer of Missouri as Custodian of Second Injury Fund*, 404 S.W.3d 322, 325-26 (Mo. App. E.D. 2012). Thus, because § 287.067 specifically recognizes occupational diseases as compensable injuries, we find that § 287.220.3(2)(a)a(ii) refers generally to "a compensable injury" and does not exclude a specific category of injury.

*Lexow v. Boeing Co.*, 2021 WL 1880933 *7 (Mo. App. E.D. May 11, 2021). Thus, the Commission found Claimant's work-related carpal tunnel syndrome qualified as a preexisting disability under Section (ii).

Indeed, the Commission's decision is further supported because the legislature has amended workers' compensation law and Section (ii) over the years, but the language upon which the Fund now relies has remained the same. *See Peters*, 404 S.W.3d at 324, 325. The *Peters* court found this of particular importance when the legislature amended the workers' compensation law in 2005 "to raise the threshold for obtaining workers' compensation," but elected not to amend Sections 287.220.3(5) or 287.220.1 and limit the Fund's liability to injuries by accident and exclude coverage for injuries by occupational disease. *Id.* at 325 (quoting *Duever v. All Outdoors, Inc.*, 371 S.W.3d 863, 867 (Mo. App. E.D. 2012)). We find this even more significant because two years after *Peters*, in an endeavor to keep the Fund solvent, the legislature again did not change this statute. Pursuant to long-standing principles of statutory interpretation, we recognize the legislature's intent as evidenced by its decision not to exclude such coverage when it had sufficient opportunity to do so. *See id.*

15

In conclusion, Section (ii) refers generally to "a compensable injury," and we find it does not exclude from such injury the specific category of occupational diseases, defined as compensable in Chapter 287 as a whole. Thus, the Commission did not misapply the law in Section (ii), and did not err in finding Claimant's preexisting bilateral carpal tunnel syndrome qualified under Section 287.220 because they were the result of compensable injuries. The Fund's cross-appeal is denied.

## Conclusion

The Commission's award is reversed and remanded with instructions that it grant Claimant PTD benefits from the Fund.

_____
Lisa P. Page, Presiding Judge

Gary M. Gaertner, Jr., Judge and
Angela T. Quigless, Judge, concur.